UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAR 29 2004

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

| | |
|---|---|
| DIGITAL ENVOY, INC. | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| GOOGLE, INC. | ) |
| | ) |
| Defendant | ) |
| | ) |

CIVIL ACTION: **1:04-CV-0864**

JURY TRIAL REQUESTED

**CAP**

## COMPLAINT

Plaintiff Digital Envoy, Inc. ("Digital Envoy"), for its Complaint against Defendant Google, Inc. ("Google"), respectfully shows the Court the following:

### *Summary of Complaint*

1.    Digital Envoy brings this action because Google is using Digital Envoy's technology in non-permitted ways. Digital Envoy seeks to recover for Google's wrongful use of Digital Envoy's technology which helped grow Google's business at a phenomenal rate without Google properly compensating Digital Envoy. Digital Envoy is the inventor and market leader in IP Intelligence technology which enables the determination of the geographic location of any computer hooked to the Internet by reliably and rapidly tracking protocol addresses.

FORMS RECEIVED
Consent To US Mag
Pretrial Instructions
Rule VII-XIV

2.    In November 2000, Digital Envoy and Google entered into an agreement permitting Google to use Digital Envoy's technology for limited uses.  At the beginning of this business relationship, Google properly used the technology on its search site for a variety of purposes, including selling what is referred to by Google as "paid links" (or links directly related to a user search on Google.com which are paid for by third parties who want to highlight their products to users and are highlighted as such on Google.com).

3.    Later, Google expanded its business model and began to service non-search related advertising on third party sites and sell geographically targeted advertising on those sites — using Digital Envoy's technology outside the scope of the license and without compensating Digital Envoy. From this wrongful conduct, Google has built a vast and profitable online advertising business (which is a $7.2 billion/year industry and growing), and Digital Envoy has lost substantial income opportunities.  Digital Envoy brings this action to recover its lost income, to disgorge Google from its wrongful income, to prevent Google from further wrongful conduct, and to recover additional damages as provided by law.

### Parties, Jurisdiction and Venue

4.    Digital Envoy is a Georgia corporation with its principal place of business in Norcross, Georgia.  The company was formed in October 1999

by the inventors of the technology which is the subject of this action and others.

5.    Google, Inc. is a California corporation with its principal place of business at its "Googleplex" in Mountain View, California.  In August 2003, Google registered as a foreign profit corporation with the Secretary of State of Georgia.  Its registered agent for service of process in Georgia is Corporation Service Company, 40 Technology Pkwy South, #300, Norcross, Georgia 30092.

6.    Google is subject to the jurisdiction of this Court pursuant to Georgia's Long-Arm Statute, O.C.G.A. § 9-10-91 in that Google transacts business within Georgia, has committed a tortious act or omission within Georgia, has committed a tortious injury in Georgia which was caused by actions or omission outside of Georgia and Google regularly does or solicits business and derives substantial revenue from services rendered in Georgia, and owns, uses or possesses real property situated in Georgia.

7.    This Court has jurisdiction over this dispute under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different States. Digital Envoy is a citizen of the State of Georgia and Google is a citizen of the State of California.  This Court also has jurisdiction over this dispute

- 3 -

under 28 U.S.C. § 1331 in that this action arises, in part, under the laws of the United States and the remainder of the claims are subject to the supplemental jurisdiction of this Court under 28 U.S.C. § 1367.

8.    Venue is proper in this District and Division under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of the property that is the subject of the action is situated in this district and division.

### Factual Allegations

#### Digital Envoy and its Technology

9.    Digital Envoy invented and developed technology ("IP Intelligence") which essentially delivers specific information about a visitor to a website, including: geographic location down to the closest city, connection speed and, in some cases, the industry in which the visitor works.

10.    IP Intelligence represents a substantial breakthrough in Internet technology. The Internet contains more than 4 billion IP addresses, which incorporate no geographical information. Furthermore, IP addresses are assigned in random order, providing no logical associations based on the numbers. Digital Envoy's proprietary technology essentially maps the Internet's ever changing topology and overlays a geographical map which allows the technology to tie an IP address to a geographic location. Digital

- 4 -

Envoy has applied for a patent covering certain aspects of its technology and has received favorable indication from the Patent and Trademark Office.

11. Digital Envoy delivers the information obtained through IP Intelligence with industry-leading reliability and virtually instantaneous speed which is essential for the practical uses of this information.

12. Digital Envoy's customers benefit from this information in a variety of ways, such as permitting the assemblage of basic market data, enabling the website to publish its content in the visitor's language, enhancing security and enabling geographically targeted advertising.

13. IP Intelligence also provides a superior manner of collecting this basic information, which otherwise would be obtained through the use of privacy-invading "cookies" or intrusive user questionnaires, either of which are more susceptible to abuse.

14. Digital Envoy's simple business model is predicated upon receiving payment for its customers' fair use of this limited information. Accordingly, its customers are restricted in their use of this information, such that it is not readily made available to third parties, except when expressly permitted in an agreement which fairly compensates Digital Envoy. These restrictions are necessary to not foreclose Digital Envoy's business opportunities (either directly or indirectly) to do business with third party web sites directly.

15.    Digital Envoy's proprietary technology has significant and independent economic value to Digital Envoy because it is unique, and not generally known to, or readily ascertainable by proper means, by other persons who could obtain economic value from the use or disclosure of this technology.  Furthermore, since the value of Digital Envoy's IP Intelligence technology is the delivery of information, the company takes reasonable measures to protect the unauthorized distribution of this information. Specifically, without limitation, Digital Envoy restricts its customers for specific licensed uses and transmits the information (known as Digital Envoy's "Database Library") in encrypted binary format.

16.    One of the most profitable uses of Digital Envoy's IP Intelligence technology is to enable its users to geographically target advertising on their website.  By instantaneously obtaining the geographical location of a visitor down to the closest city, the customer can target specific advertising relevant to the visitor.

17.    The ability to target advertising in this matter is attractive to advertisers reluctant to buy Internet advertising which would otherwise be sent all over the world.  Digital Envoy's customers can thus sell more advertising, and the advertising is more successful and thereby more profitable to the customer since Internet advertising is often paid on a click-

through basis, meaning the advertiser pays when a computer user actually clicks on the advertisement. Since geographically targeted advertising is more relevant to the customer's visitors, the "click-through rate" (or whatever other measure of success of the ad is employed) is often higher than un-targeted advertising.

18.    By filling this niche, Digital Envoy has developed into a small but profitable and growing business.

### Google Background

19.    Google is an Internet search engine company formed in September 1998. Through excellent technological innovations and strong financial backing, Google became the world's largest search engine in mid-2000.

20.    Google is a play on the word "googol" which refers to the number represented by the number 1 followed by 100 zeros. Google's use of the term reflects the company's mission to organize the immense, seemingly infinite amount of information available on the web.

21.    Google portrays itself as having started with a couple of students with an innovative idea who opened its door in an office attached to a garage of a friend. The Googleplex, as Google's present world headquarters is known, is (or was) complete with lava lamps, roving large dogs, a chef who is a Dead-head (a fan of the musical group, the Grateful Dead), and room in the

parking lot for twice-weekly roller hockey games. Google claims it is working on offering searches in the fictional Klingon language from the television show StarTrek.

22.    At the same time, Google is backed by funding from two leading venture capital firms and has a management team, board of directors and technical advisory council that rivals any company in the world for business and financial acumen. Its two founders have also just joined *Forbes'* billionaire club. Google also exceeded $1 billion in revenue in 2003, mostly from advertising, and the company is valued at more than $15 billion.

23.    As with many Internet-based companies, Google did not make a profit in its first three years. Google's principal source of income originally came from marketing its search technology to other Internet-based companies. At the same time, Google offered limited "paid link" opportunities on its website. However, as described below, Google soon began to expand its business from pure search into advertising and the company soon thereafter achieved elusive *profitability.*

### *The Agreement between Google and Digital Envoy*

24.    Google's "paid link" program began in mid-2000 and was originally centered on the ability to offer paid links or relevant information tied to a user's search request. Thus on its site, through keyword targeting or "paid

- 8 -

links", only those users who are actively conducting a web search and requesting information related to a third party's product are shown that third party's message. The third party pays Google for its placement of its "paid link" on Google.com.

25.    Google recognized that one factor in the relevance of paid links is geography. Accordingly, shortly after it began its paid link program, Google was attracted to Digital Envoy's technology which would permit paid link results which was geographically targeted to its audience.

26.    In November 2000, Google and Digital Envoy began to negotiate a license agreement whereby Google would have use of Digital Envoy's IP Technology to obtain the geographic location of visitors to its website, presumably to publish Google's site text in the visitor's language without prompt and to sell geographically targeted "paid links" on its website.

27.    On November 30, 2000, Google and Digital Envoy entered into a Product and Electronic Database Evaluation and License Agreement (the "Agreement").

28.    Under the Agreement, Google obtained a strictly limited, non-exclusive right to use Digital Envoy's IP Intelligence technology and Database Libraries only in Google's business of producing and maintaining *information search* technology and for no other business purpose (emphasis

added). Additionally, Google is expressly prohibited from selling, licensing, distributing, sharing or otherwise giving, *in any form*, the Database Libraries to any other party or using it outside of Google's site.

29.    Under the Agreement, Digital Envoy retained all ownership of the Database Libraries, including any patents, copyrights or trade secrets associated with the Database Libraries of its IP Intelligence technology. Google is also obligated under this Section to hold all of Digital Envoy's product information in strict confidence and is prohibited from sharing such information with any third parties, and from distributing, disclosing or *otherwise making available* the Database Libraries, or any information contained therein to any other party whatsoever.

30.    Google is also obligated under the Agreement to promptly notify Digital Envoy of any possible infringement of Digital Envoy's rights in the Database Libraries.

31.    For the use of Digital Envoy's IP Intelligence technology, including the Database Libraries, Google pays to Digital Envoy a flat monthly fee, originally $3,000 during the evaluation period and currently $8,000 per month.

*Google's use of Digital Envoy's technology*

32.    Google used Digital Envoy's IP Intelligence technology to enable geographically targeted paid links, solely in conjunction with a user search, on its information search technology website. Such targeting fit well with Google's business program and was incorporated into Google's promotional materials directed to potential third party paid link purchasers on its website.

33.    Google's paid link program as well as its third party ad network program, as it is directed to outside companies on Google's search site, is called "AdWords" by Google. Google also has a Premium Sponsorship program for large participants to negotiate a specific agreement with Google. Companies signing up to use paid links through the AdWords program pay Google based on cost-per-click such that Google benefits financially when advertisements placed by Google are "clicked" on by the visitor to the site.

34.    To enhance the "click through rate", companies signing to obtain paid links and to participate in the Google Ad Network through the AdWords program are offered the option to geographically target their link. In fact, the first of the four steps required to sign up for the Google AdWords program requests the advertiser to choose its geographic targets, which, unless "All Countries" and "All Languages" are chosen, requires use of Digital Envoy's technology.

35.    The Premium Sponsorship paid link and ad network program is also
based on the success of the paid link or advertisement, measured by the click
through rate or some other measure, and also permits geographic targeting.

36.    At the time of the Agreement, Google had just begun to sign
agreements with other Internet companies to power search services on those
companies' sites. However, Google did not supply advertising services to
third party web sites at that time, had not contemplated providing such
services and did not disclose to Digital Envoy its intention to enter into this
business. Instead Google's business at the time was solely related to
information search.

37.    On the strength of Google's targeted paid link program, which
included Regional Targeting using Digital Envoy's IP Intelligence, Google
had signed up more than 350 Premium Sponsorships and thousands of
AdWords participants by mid-2001. Due to Google's targeted paid link
program on Google.com, its click through rates at that time were four to five
times higher than click through rates for traditional advertisement programs.

*Google's misuse of Digital Envoy's technology*

38.    By August 2002, Google began to enter into agreements to provide
Google advertisements (including advertisements developed under its

- 12 -

AdWords program) on third party websites to which it was providing search services.

39.    In February – March, 2003, Google began to syndicate advertisements to major advertising networks supporting nearly 24,000 websites. Google announced that it entered into this arrangement as part of a test of a new service to place text ads on pages selected for their relevance to a marketer's products or services. Thus, for the first time, Google announced plans to place cost-per-click listings on content-targeted websites, rather than search-related pages. Google advertisers, including the more than 100,000 active advertisers in its Google AdWords program, would thereafter have the option to appear on websites unrelated to search. Google's business thus was expanding outside of information search.

40.    In May – June 2003, Google launched a new program which it called "Google AdSense" wherein Google would supply advertisements to any content-based website which signed up. Google announced that the program was designed to maximize the revenue potential of a website by serving highly relevant ads specific to the content of the page. Under this program, Google and the AdSense client share in revenue paid by the advertisers, typically on a per click basis or some other measure of the success of the advertisement on the AdSense client's website. Google's

initial clients in the AdSense program included ABC.com, HowStuffWorks,

Internet Broadcasting Systems, Inc., Lycos Europe, New York Post Online

Edition, Reed Business Information and U.S. News & World Report.

Google refers to third party web sites in its AdSense program and the

delivery of advertisements on such sites, as the "Google Ad Network."

41.     As part of the service it provides to its clients, Google uses Digital

Envoy's IP Intelligence technology and Database Libraries to provide

geographically targeted, non-information search related, advertisements on

those third party websites in the "Google Ad Network". Such use is beyond

the scope of the Agreement between Google and Digital Envoy. Google did

not obtain authorization from Digital Envoy to make such use and did not, in

fact, tell Digital Envoy that it was doing so.

42.     Due in large part to the strength of its AdSense program, Google more

than doubled its revenues from 2002 to 2003, and the trend continues

upward in 2004. Google specifically makes substantial income and profit

from the placement of geographically targeted, non-information search

related, advertisements on its client's websites in the Google ad network.

43.     At the same time, Digital Envoy has received no income from

Google's unauthorized use of Digital Envoy's proprietary technology, but

instead has lost significant licensing opportunities.

44.    In February 2004, Digital Envoy notified Google that it considered

Google's use of Digital Envoy's IP Intelligence technology and Database

Libraries to provide geographically targeted advertising on third party

websites to be unauthorized under the Agreement.  Google admitted to its

conduct but refused to stop.  Instead, in response to Digital Envoy's inquiry,

Google offered to increase its payment under the Agreement to $12,000 per

month.  Digital Envoy rejected this offer because it fell woefully short of the

income enjoyed by Google and the lost income to Digital Envoy as a result

of Google's unauthorized conduct.

## Count I
## (Misappropriation of Trade Secrets)

45.    Digital Envoy incorporates its allegations contained in paragraphs 1

through 44 as if fully stated herein.

46.    Digital Envoy's IP Intelligence and its Database Libraries are trade

secrets, protected by law.

47.    Although acquired by lawful means, Google's misuse of Digital

Envoy's trade secrets constitutes a misappropriation in that it was acquired

under circumstances giving rise to a duty to maintain its secrecy or limit its

use and that Google used Digital Envoy's trade secrets through improper

means.

48.    Google's misappropriation of Digital Envoy's trade secrets have damaged Digital Envoy through lost income, licensing and other business opportunities.

49.    Google's misappropriation of Digital Envoy's trade secrets have also unjustly enriched Google.

50.    Digital Envoy is entitled to recover damages against Google in amounts to be proved at trial.

51.    Google's actions have been willful and malicious.  Accordingly, Digital Envoy is entitled to recover punitive damages against Google in amounts to be determined by the enlightened conscience of the jury.

## COUNT II
## (Federal Unfair Competition)

52.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 51 as if fully stated herein.

53.    Google's actions, as set forth above, made in connection with services and used in commerce, falsely designate the origin of its services, are misleading in their description or representation of fact.  Google's actions deceive others (including its AdSense and AdWords customers) as to the origin and approval of its services and its commercial activities and Digital Envoy is damaged by this conduct.  Google's actions thus constitute violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

54.    Google acted as set forth above with knowledge and in disregard of Digital Envoy's rights.

55.    Digital Envoy is entitled to recover its actual damages, Google's profits, treble damages and its attorneys' fees.

56.    In the manner set forth above, Google has also irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

## Count III
## (Unfair Competition under Georgia Law)

57.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 56 as if fully stated herein.

58.    As set forth above, Google has engaged, and is continuing to engage in acts of unfair competition in violation of O.C.G.A. § 10-1-372.

59.    Google acted as set forth above with knowledge and deceit and in disregard of Digital Envoy's rights and has caused Digital Envoy actual damages.

60.    In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

61.    Digital Envoy is thereby entitled to recover its attorneys' fees from Google.

## COUNT IV
## (Common Law Unfair Competition)

62.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 61 as if fully stated herein.

63.    The actions of Google set forth above constitute unfair competition in violation of common law in that:

(a)    the actions enable Google to obtain the benefit of, and trade on, the goodwill of Digital Envoy;

(b)    the actions by Google damage Digital Envoy in that Digital Envoy has no control over the business of Google;

(c)    the actions of Google are likely to cause, and have caused, confusion, mistake or deception; and

(d)    the actions of Google will result in the unjust enrichment of Google.

64.    Google acted as set forth above with knowledge, in bad faith and in willful disregard of Digital Envoy's rights.

65.    In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court.  Digital Envoy is without an adequate remedy at law.

66.    Digital Envoy is also entitled to an award of damages to be proved at trial, punitive damages and attorneys' fees.

- 18 -

## COUNT V
### (Common Law Unjust Enrichment)

67.    Digital Envoy incorporates its allegations contained in paragraphs 1
through 66 as if fully stated herein.

68.    As set forth above, Google has used and continues to use Digital
Envoy's technology and information for purposes outside the scope of the
Agreement.

69.    Google and Digital Envoy had no agreement or understanding which
would govern the relationship of the parties for the extra-contractual use set
forth above.

70.    In this manner, Google has received distinct and direct benefits from
Digital Envoy, but without compensating Digital Envoy.  Google has
thereby been unjustly enriched.

71.    Accordingly, Digital Envoy is entitled to recover from Google all
monies earned in connection with Google's extra-contractual use of Digital
Envoy's proprietary technology and information, in amounts to be proved at
trial.


WHEREFORE, Plaintiff Digital Envoy, Inc. prays for a trial by jury on all
issues, judgment in its favor and against Defendant Google, Inc. for actual
damages, disgorgement of profits, recovery of monies earned, treble

damages, punitive damages, attorneys' fees interest and costs, and for an injunction prohibiting Defendant Google, Inc. from using Digital Envoy's proprietary technology and information beyond the scope of the Agreement, specifically including supplying geographically targeted advertisements on third party websites.

Respectfully submitted this 29th day of March , 2004.

Timothy H. Kratz
Georgia Bar No. 429297
Luke Anderson
Georgia Bar No. 018330
John A. Lockett, III
Georgia Bar No. 455549

**McGuireWoods LLP**
1170 Peachtree Street, NE
Suite 2100, The Proscenium
Atlanta, Georgia 30309-1234
Telephone: (404) 443-5730          Attorneys for Plaintiff
Facsimile: (404) 443-5784          Digital Envoy, Inc.

AO 440 (Rev. 10/93) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

## SUMMONS IN A CIVIL CASE

DIGITAL ENVOY, INC.,

      Plaintiff

V.                         CASE NUMBER: _____

GOOGLE, INC.,                  **1:04-CV-0864**

      Defendant.

TO: (Name and address of Defendant)

      Google, Inc.
      c/o Corporation Service Company,
      Registered Agent
      40 Technology Parkway South, #300
      Norcross, Georgia 30092

      **YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

      Timothy H. Kratz, Esq.
      McGuireWoods LLP
      1170 Peachtree Street, N.E.
      Suite2100, The Proscenium
      Atlanta, GA 30309-1234

an answer to the complaint which is herewith served upon you, twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

___LUTHER D. THOMAS___      ___MAR 29 2004___
CLERK                         DATE

_____
(By) DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action

# RETURN OF SERVICE

|  | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left:_____

☐ Returned unexecuted:_____

☐ Other *(specify)*:_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                    Date                               Signature of Server

_____
Address of Server

\\COM\282673.1

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.