FILED IN CLERK'S OFFICE
APR 1 6 2004

LUTHER D. [...], Clerk
By: [...] Deputy

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DIGITAL ENVOY, INC., | CIVIL ACTION NO. 1:04-CV-0864 (CAP) |
| Plaintiff, | |
| v. | |
| GOOGLE, INC., | |
| Defendant. | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## EMERGENCY MOTION FOR EXPEDITED DISCOVERY IN
## AID OF POTENTIAL MOTION FOR PRELIMINARY INJUNCTION

### Introduction

According to Plaintiff Digital Envoy, Inc. ("Digital Envoy), Defendant Google, Inc. ("Google") *may* be using its IP geo-targeting data in Google's new electronic mail system known as Gmail. Digital Envoy believes that such a use of its data would be beyond the scope of the parties' Product and Electronic Database Evaluation and License Agreement (the "Agreement"). And, assuming those facts are correct, Digital Envoy suggests that it *might* seek a preliminary injunction. On that basis, Digital Envoy asks this Court to take the extraordinary step of authorizing discovery mere days after Digital Envoy filed its complaint – long before the parties have had a Rule 26 meeting of counsel. Digital Envoy's request

is misguided for several reasons, each of which offers an independent basis for denying Digital Envoy's Motion for Expedited Discovery in Aid of Potential Motion for Preliminary Injunction ("Digital Envoy's Motion").

*First,* Digital Envoy has filed both its complaint and its Motion with the wrong court. Section 12 of the Agreement requires that **"[a]ny lawsuit regarding this Agreement shall be filed in the state or federal courts in Santa Clara County, California."** Exhibit A. This lawsuit is undeniably one "regarding the Agreement." The crux of the dispute is whether Google's use of Digital Envoy's technology falls within the license granted to Google in the Agreement. Accordingly, the lawsuit should not have been filed in Georgia but in California, in accordance with the Agreement's forum selection clause. Any issues related to Digital Envoy's claims – including whether early discovery should be allowed – should likewise be resolved in the contractually-agreed upon forum.

*Second,* the key question underlying Digital Envoy's Motion – whether Google is using Digital Envoy's data in Gmail – is easily answered without discovery: Gmail does not use Digital Envoy's data.

*Third,* even if Google were using Digital Envoy's data in Gmail – and it is not – that use would be indistinguishable from Google's use of Digital Envoy's data as part of its contextual ad program, which has been openly in operation for a

1755720v2

year without objection from Digital Envoy. Digital Envoy thus could not show irreparable harm from the incremental use of the data in Gmail that it has imagined. Accordingly, there is no credible justification for expedited discovery.

For each and every of these reasons, Digital Envoy's Motion should be denied.

## Statement of Facts

Google and Digital Envoy entered into their Agreement on November 30, 2003. The Agreement was subsequently amended twice and then, after its expiration, reinstated with a ratification agreement dated January 1, 2003. Exhibits B-D.[1] From the inception of the Agreement, Google used Digital Envoy's IP geo-targeting data to search for relevant online advertisements to present to users based, in part, on the assumed geographic location of the user visiting the website on which the ads are to be shown.

In February 2003, Google expanded its ads program by allowing websites to display Google-supplied ads based on the content of a webpage. As explained in an early article about this program, "Google uses its algorithmic search technology to scan content pages and determine relevant listings to serve. For example, a

---

[1]    See Declaration of Steven Schimmel, a copy of which is attached hereto as Exhibit E, affirming that Exhibits A-D are true and accurate copies of the documents. The original of Mr. Schimmel's Declaration is attached to Defendant's Memorandum of Law in Support of Its Motion to Dismiss, as Exhibit F.

visitor to a sports page reading about the Boston Bruins game might see paid listings to the side for buying Bruins tickets or paraphernalia." Exhibit F. As with its previous advertisements, these "contextual" ads were sometimes chosen based, in part, on the assumed geographic location of the web user. Google's launch and operation of this program received widespread acclaim, and drew no objection from Digital Envoy.

On April 1, 2004, Google announced a new web-based e-mail system called Gmail. Although Gmail has been released to a limited group, it is not in open release to the general public and is still being tested. Exhibit G. Gmail users are sometimes shown ads appearing next to the web pages that display the e-mail messages they are reading. Google selects the ads based on the content of the e-mail messages. *Google does not, however, use Digital Envoy's IP geo-targeting data when selecting ads to display in Gmail.*[2] See Declaration of Michael Tsao at ¶ 3, attached hereto as Exhibit H.

Aside from the fact that Google does not use Digital Envoy's IP geo-targeting data when placing ads next to Gmail e-mail messages, the process by which Google searches for relevant ads for display on Gmail web pages is

---

[2]     Indeed, Google's counsel explained this to Digital Envoy's counsel in no uncertain terms before Digital Envoy filed its Motion. See Declaration of David H. Kramer, attached hereto as Exhibit I.

1755720v2

essentially the same as the process by which Google has been searching for relevant ads to display as part of the contextual ad program it has been operating since early 2003. Gmail web pages are merely one more place in which Google's contextual ads can be seen.

### Argument

I.  **DIGITAL ENVOY'S MOTION FOR EXPEDITED DISCOVERY SHOULD BE DENIED, BECAUSE DIGITAL ENVOY HAS FILED ITS COMPLAINT IN THE WRONG VENUE.**

Filed contemporaneously herewith is Google's Motion to Dismiss or Transfer on the ground that venue does not properly lie in this Court. As explained in greater detail in Google's Motion, Digital Envoy's complaint raises claims that are indisputably claims regarding the Agreement. According to Digital Envoy, Google's use of Digital Envoy's IP geo-targeting data to search for and place ads based on the content of a website is not a "search related" use of that data and thus, according to Digital Envoy, is beyond the scope of the Agreement. See Compl. at ¶ 21, attached hereto as Exhibit J. As Digital Envoy is well aware, Google disagrees.

The merits of the parties' dispute over the scope of the Agreement will need to be determined by a court – but the Agreement's forum selection clause plainly requires that this determination be made by a court in Santa Clara County,

1755720v2

California.   Any subsidiary issues – such as whether expedited discovery is appropriate – should also be made by a Santa Clara County court.

## II.   GOOGLE'S GMAIL SYSTEM DOES NOT USE DIGITAL ENVOY'S IP GEO-TARGETING DATA.

Even if this was the proper Court to adjudicate Digital Envoy's claims, Digital Envoy's Motion should be denied.   Digital Envoy's Motion is based on the mistaken assumption that Google may be using Digital Envoy's IP geo-targeting data when searching for relevant ads for display on Gmail web pages.

As noted, Gmail does not use Digital Envoy's IP geo-targeting data. Moreover, Google has no plans to begin using Digital Envoy's IP geo-targeting data in Gmail.   See Declaration of Michael Tsao at ¶ 3.    Digital Envoy's speculation to the contrary, based on out-of-context snippets from Google materials, is simply unfounded.

## III.   THERE IS NO "EMERGENCY" JUSTIFYING PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY.

Finally, even if venue *did* properly lie in this Court, and even if Google *were* using Digital Envoy's data in Gmail, there *still* would be no basis for expedited discovery. "Expedited discovery is not the norm.  Plaintiff must make some *prima facie* showing of the *need* for the expedited discovery." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor, 194 F.R.D. 618, 623 (N.D. Ill. 2000); see also

1755720v2

Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.P.A. v. Helio Import/Export, Inc., 601 F. Supp. 1, 3 (S.D. Fla. 1983) (noting that expedited discovery may be appropriate if "some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time."). Digital Envoy has not, and cannot, make this showing because there are no exigent circumstances compelling expedited discovery.[3]

Because Gmail is an Internet-based e-mail service, the advertisements that appear next to certain e-mail messages in Gmail are simply advertisements on web pages. Google computers search through the text of e-mail messages to locate contextual cues, and then search through Google's inventory of advertisements to select ads that are relevant to those messages. Except for the lack of any use of Digital Envoy data in selecting those ads, *the process is no different than the process used in Google's contextual ad program that Google has been offering on web pages for a year.* Throughout the past year, Digital Envoy has raised no objection to Google's highly publicized contextual ad program, or to Google's use of Digital Envoy's data in that program.

---

[3] One factor courts consider in determining whether there is a compelling need for expedited discovery, including court decisions cited by Digital Envoy, is whether a hearing for a preliminary injunction is pending. See Entertainment Technology Corp. v. Walt Disney Imagineering, 2003 WL 22519440, *5 (E.D. Pa. Oct. 2, 2003); Tefel v. Reno, 972 F. Supp. 608 (S.D. Fla. 1997). Here, there is no pending hearing or any other set of circumstances creating an "emergency."

While Google submits the lack of objection demonstrates that its use was within the scope of the parties' Agreement, at a minimum it shows that the program is causing Digital Envoy no harm, much less the irreparable harm necessary to support a request for expedited discovery. See Qwest Communications Int'l, Inc. v. Worldquest Networks, Inc., 213 F.R.D. 418 (D. Colo. 2003) (denying motion for expedited discovery, in part, because party did not present evidence showing irreparable injury); Fimab-Finanziaria, 601 F. Supp. at 3 (stating that motion for expedited discovery "should be entered only in the most unusual circumstances in which irreparable harm would otherwise occur"); Entertainment Technology, 2003 WL 22519440, *5 ("Irreparable harm is one factor to consider in deciding this motion.").[4]

## **Conclusion**

Digital Envoy's Emergency Motion for Expedited Discovery should be decided, as should any other issues regarding the Agreement, by a court in Santa Clara County, California. Digital Envoy's request for intrusive and extraordinary

---

[4]    An injury is "irreparable" only if it cannot be undone through monetary remedies, and the possibility that adequate compensatory relief will be available at a later date, in the ordinary course of litigation, "weighs heavily against a claim of irreparable harm." Northeastern Florida Chapter of the Ass'n of General Contractors of America v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (citations omitted). Digital Envoy claims that if its allegations regarding Gmail are true, Google will be liable under the same causes of action set forth in Plaintiff's complaint. Plaintiff's Brief at 4. Digital Envoy's request for lost income and profits to compensate for its alleged injuries affirms that the injuries are all reparable. Compl. at ¶¶ 3, 44, 48, 55, 70.

discovery is, in any event, mooted by the fact that Gmail does not use Digital Envoy's data. Finally, the Motion is neither an "emergency" nor is the discovery it seeks necessary. Google, therefore, respectfully requests that this Court deny Digital Envoy's Motion.

Dated this 16th day of April, 2004.

OF COUNSEL:

David H. Kramer
WILSON SONSINI GOODRICH &
ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: 650.493.9300
Facsimile: 650.493.6811

By: _____

Stephen M. Dorvee, Bar No. 226989
Scott E. Taylor, Bar No. 785596
Adam Gajadharsingh, Bar No. 266978
ARNALL GOLDEN GREGORY LLP
2800 One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3450
Telephone: 404.873.8500
Facsimile: 404.873.8501

Attorneys for Defendant
Google, Inc.

## CERTIFICATE OF SERVICE

I do hereby certify that the foregoing *Defendant's Response to Plaintiff's Emergency Motion for Expedited Discovery in Aid of Potential Motion for Preliminary Injunction* was served by United States mail, first-class, with postage attached to:

> McGuire Woods LLP
> Timothy H. Kratz, Esq.
> Luke Anderson, Esq.
> John A. Lockett, III, Esq.
> 1170 Peachtree Street, NE
> Atlanta, Georgia 30309-1234

This is to certify, pursuant to Local Rule 7.1(D), that the font and point size, Times New Roman 14, used in this brief comply with Local Rule 5.1(D).

This 16th day of April, 2004.

Adam Gajadharsingh

1755720v2



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**



*Copy –*
*Note: Amendment*
*Sec. 2 modifies*
*Payment to*
*$4500/mth*
*SS*

**THIS PRODUCT AND ELECTRONIC DATABASE EVALUATION AND LICENSE AGREEMENT** (this "Agreement") is made and entered into as of the ____ day of November, 2000, by and between **Google, Inc.** ("Licensee") and **Digital Envoy Inc.** ("Licensor"):

## WITNESSETH:

WHEREAS, Licensee is in the business of producing and maintaining information search technology (the "Business"); and

WHEREAS, Licensee desires to secure from Licensor the right to use Licensor's Personum product (the "Product") and certain geographic/IP address databases (the "Database Libraries") for purposes of utilizing the Product and the Database Libraries in the Business (the "Service");

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

### Section 1
### DATABASE LIBRARIES

Licensor agrees to establish and maintain the Database Libraries in a form suitable for Licensee's use pursuant to this Agreement. It is agreed that the form suitable for Licensee's use shall be electronic with data stored in a server database licensed in conjunction with the Product.

### Section 2
### LICENSOR SUPPORT AND LICENSEE RESPONSIBILITIES

Licensor agrees to provide electronic updates of the Database Libraries to Licensee, no less frequent than monthly. The updates shall have the most recent geographic/IP address data compiled by Licensor. It is understood that Licensor shall have no responsibility to maintain or support Licensee's content serving network. The Database Libraries shall be treated as confidential and proprietary information of Licensor, and except as otherwise noted herein the receiving party shall not disclose such information, directly or indirectly, to any third party, without the consent of the disclosing party. Licensor shall provide Licensee with on-going 24/7 technical support.

Licensee shall be responsible for supplying a server that meets the following specifications:

      a. Pentium III Xeon 550 MHz Linux server; dual processors preferred with a minimum of 512 Mb of RAM;
      b. High speed Ethernet card or other network interface card that interfaces with Licensee's network;
      c. Minimum of 10 gigabyte hard drive on a SCSI bus, RAIDing optional;
      d. Providing an Internet routable IP address for the server.

Licensor shall be responsible for providing Licensee with Information to configure its server to interface with Licensor's central servers and shall provide Licensee with a C, Java or Perl API that encompasses functions that allow Licensee to interface to Licensor's database. The parties agree to establish commercially reasonable security measures with respect to such interface. Licensor shall not be responsible for supporting Licensee's server(s) or other hardware.

## Section 3
## GRANT OF RIGHTS

Licensor hereby grants Licensee the limited, worldwide right to use in its Business (and not distribute to any third party in whole or in part) the Product and the Database Libraries. Such right shall be nonexclusive. Such rights shall be strictly limited to the right to:

Doc# 273228 V#01

1. Input, download, and store some or all of the Database Libraries in files and memory; and compile some or all of the Database Libraries at the Site. Licensee may also use the Database Libraries to develop indices, services, or applications that are provided to third parties (e.g., developing a country-specific index of web pages). In no event, however, are the Database Libraries to be sold, licensed, distributed, shared or otherwise given (in any form) to any other party or used outside of the site set forth herein.

2. **Access and use the Database Libraries in the Business only at the Site.** The "Site" shall be defined as Google's offices and data centers.

## Section 4
## RESERVED RIGHTS

Licensor reserves the right to use the Database Libraries for its own business purposes and reserves the right to distribute the Database Libraries to others in the course of its business as it sees fit. Nothing in this license shall in any way restrict Licensor's or its customers' use of its Database Libraries.

## Section 5
## PAYMENT AND EVALUATION PERIOD

**5.1** Licensee shall pay Licensor a monthly fee of three thousand dollars ($3,000) per month during the term of this Agreement for access to Licensor's geographic tailoring Product and the Database Libraries. Notwithstanding the foregoing, Licensor and Licensee acknowledge that it may take a brief period of time for Licensee to evaluate whether the Product and the Database Libraries will be useful in Licensee's business. Hence, subject to the terms and conditions of this License, Licensee shall be permitted to use the Database Libraries and the Product for a period of fourteen (14) days, without

Doc# 273320 V301

charge and may terminate this agreement during such fourteen (14) day period in the event that Licensee, in its reasonable discretion, determines that the Database Libraries and Product are not useful for Licensee's business needs.

**5.2** Licensee shall pay to Licensor all amounts accruing with respect to charges billed in each calendar month within 30 days after the said payment is due. There shall be applied to any amounts not paid by Licensee when due a delinquency charge of Eighteen Percent (18%) per annum prorated for partial periods of the unpaid principal balance thereof, commencing to accrue the calendar day after such due date.

## Section 6
## NO OTHER PAYMENT, ETC.

Except as expressly provided in this Agreement, neither party shall be entitled to any payment, cost reimbursement, or other compensation from the other party in respect of its performance, and each party shall bear all its own expenses incurred in rendering performance.

## Section 7
## PROPRIETARY PROTECTION

**7.1** As between the parties hereto, Licensor shall be the sole owner of the Database Libraries, including any patents, copyrights or trade secrets associated with the Database Libraries or the underlying applications.

**7.1a** As between the parties hereto, Licensee shall be the sole owner of any services or products developed using the Database Libraries (but excluding the Database Libraries), including any patents, copyrights or trade secrets associated with such services or products.

**7.2** Licensee shall have no right to copy or reverse engineer the Database

Doc# 273226 V$01

Libraries and/or the Product. Except as set forth in this Agreement, in no event shall Licensee distribute, disclose or otherwise make available the Database Libraries, or any information contained therein to any other party whatsoever or at any other site other than the Site, without the express written consent of Licensor.    Licensee shall hold all of Licensor's product information, including the results of any evaluation or testing thereof by Licensee in strict confidence and shall in no event share such information with any third parties.

7.3 Licensee shall cooperate with Licensor (at Licensor's expense) with regard to any copyright registration of the Database Libraries, including updated versions thereof, that Licensor may choose to obtain. Both parties agree to cooperate with each other with respect to any other action that may be necessary or appropriate for the protection of the Database Libraries under applicable intellectual property laws.

7.4 In the event that either party discovers an instance of possible infringement of Licensor's rights in the Database Libraries, such party shall promptly notify the other. The parties shall consult with one another with respect to the action that may be appropriate to stop or remedy such infringement.

7.5 If a third party claims that the exercise by Licensee of the rights granted herein, including the provision and use of the Product based on the Database Libraries in accordance with this Agreement, infringes any patent, copyright, trade secret, or other proprietary right of any third party, Licensor will defend Licensee against that claim at Licensor's expense and Licensor will indemnify and hold harmless Licensee from and against any associated loss, liability, damage, or expense (including costs of investigation, court costs, and reasonable attorney's fees). Licensee agrees to cooperate with Licensor to determine the most cost-effective and practical means for responding to and disposing of any such matter.

**Section 8**

**WARRANTIES; LIMITATIONS; DISCLAIMER**

Doc# 273228 V:01

Licensor warrants that the Product will materially conform with its written specifications during the term of this Agreement. It is mutually acknowledged that data entry, communication and storage are subject to a possibility of human and machine errors, omissions, delays, and losses, including inadvertent loss of data or damage to media, which may give rise to loss or damage. Neither party hereto undertakes any liability to the other for any such errors, omissions, delays, or losses. EXCEPT AS STATED ABOVE, LICENSOR MAKES AND LICENSEE RECEIVES NO WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF THIS AGREEMENT OR ANY OTHER COMMUNICATION, REGARDING THE PRODUCT, THE DATABASE LIBRARIES AND THE SERVICES, AND LICENSOR SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY UNDERTAKES OR ACCEPTS ANY LIABILITY WHATSOEVER TO THE OTHER FOR ERRORS, OMISSIONS, DELAYS, INTERRUPTIONS, OR LOSSES UNLESS CAUSED BY THEIR WILLFUL MISCONDUCT. EXCEPT FOR INDEMNIFICATION UNDER SECTION 7.5, IN NO EVENT SHALL EITHER PARTY'S DAMAGES IN ANY LAWSUIT OR OTHER ACTION BROUGHT UNDER THIS AGREEMENT EXCEED THE AMOUNTS PAID BY LICENSEE HEREUNDER.

### Section 9
### TERM

This Agreement shall commence to be effective on the date first shown above and shall remain in effect for an initial term of six (6) months from the initial payment hereunder. The Agreement shall be renewable for an additional six (6) month term at the discretion of Licensee. In addition, either party may terminate the Agreement in the event that the other party commits a material breach of this Agreement, provided that the aggrieved party shall first notify the other party of the breach and give such other party at least ten (10) days to cure the breach.

### Section 10
### FORCE MAJEURE

Doc# 273228 V101

Neither party shall be liable or be deemed to be in default for any delay or failure in performance or interruption resulting directly or indirectly from any cause or circumstance beyond its reasonable control, equipment or telecommunications failure, labor dispute, or failure of any third party to perform any agreement that adversely affects such party's ability to perform its obligations hereunder.

## Section 11
## NOTICES

All notices or other communications required to be given hereunder shall be in writing and delivered either personally or by mail, courier, or similar reliable means of dispatch and addressed as provided in this Agreement or as otherwise requested by the receiving party. Notices delivered personally shall be effective upon delivery and notices delivered by any other means shall be effective upon their receipt by the party to whom they are addressed.

## Section 12
## GOVERNING LAW

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California as it applies to a contract made and performed in such state, excluding conflicts of laws principles. Any lawsuit regarding this Agreement shall be filed in the state or federal courts in Santa Clara County, California.

## Section 13
## MODIFICATION AND WAIVERS

This Agreement represents the entire understanding of the parties concerning its subject matter and may not be modified except by a writing signed by authorized representatives of both parties. A waiver by either party of its rights hereunder shall not be

binding unless contained in a writing signed by an authorized representative of the party waiving its rights. The nonenforcement or waiver of any provision of this Agreement on one occasion shall not constitute a waiver of such provision on any other occasion unless expressly so agreed in writing. It is agreed that no use of trade or other regular practice or method of dealing between the parties hereto shall be used to modify, interpret, supplement, or alter in any manner the terms of this Agreement.

### Section 14
### ASSIGNMENT

Neither party shall be entitled to assign its rights and obligations under this Agreement to any successor to the ownership, management, or operation of the facilities and services of such party relating to the subject of this Agreement, without the written approval of the other party.

### Section 15
### NO IMPLIED RIGHTS OR OBLIGATIONS

Nothing in this Agreement is intended to create any implied right to require, or any implied duty to provide, a level of effort or results (in general or in particular) not expressly stated herein, or to refrain from engaging in any other activity, including any activity involving the same or similar products or services with the same or similar customers or providers.    During the term of this Agreement, Licensor may include Licensee's name in a listing of Licensor's customers.  Before making any such listing available to the public, however, Licensor will submit the listing to Licensee to obtain written approval of its content and intended use, which approval shall not be unreasonably withheld or delayed.  Except for the foregoing, Licensor must first obtain Licensee's written consent before making any public use of Licensee's trade name, trademarks, service marks, logos, or other distinctive brand features, such public use including but not being limited to press releases and other marketing efforts.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day
and year first above written.

DIGITAL ENVOY INC.

By: _____
    Authorized Signature

Name: _Rob Friedman_
Title: _Co-President_

GOOGLE

By: _____
    Authorized Signature

Name: _URS HÖLZLE_
Title: _VP Engineering_



# EXHIBIT / ATTACHMENT

## B

**(To be scanned in place of tab)**

# digital™
### envoy

THIS FIRST AMENDMENT TO THE PRODUCT AND ELECTRONIC
DATABASE EVALUATION AND LICENSE AGREEMENT (this "Agreement") is
made and entered into as of the _21_ day of December, 2000, by and between
**Google, Inc.** ("Licensee") and **Digital Envoy Inc.** ("Licensor"):

1. The second paragraph under "WITNESSETH:" shall be amended to read as
follows:

"WHEREAS, Licensee desires to secure from Licensor the right to use Licensor's
Personum product (the "Product") and certain geographic/IP address databases
that provide information at a metropolitan area level (the "Database Libraries") for
purposes of utilizing the Product and the Database Libraries in the Business (the
"Service");"

2. The first sentence of Section 5.1 of the Agreement shall be amended to read as
follows:

"Licensee shall pay Licensor a monthly fee of Four thousand Five Hundred dollars
($4,500) per month during the term of this Agreement for access to Licensor's
geographic tailoring Product and Database Libraries"

3. The remainder of the Agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

DIGITAL ENVOY, INC.

By: _____

Authorized Signature

Name: _Rob Friedman_

Title: _Co-President_


GOOGLE, INC.

By: _____

Authorized Signature

Name: _Steve Schimmel_

Title: _Business Development_



# EXHIBIT / ATTACHMENT

## C

**(To be scanned in place of tab)**

# digital ™
### e n v o y

**THIS SECOND AMENDMENT TO THE PRODUCT AND ELECTRONIC DATABASE EVALUATION AND LICENSE AGREEMENT** (this "Agreement") is made and entered into as of the 17th day of July, 2001, by and between **Google, Inc.** ("Licensee") and **Digital Envoy Inc.** ("Licensor"):

1. Section 9 of the Agreement shall be amended to read as follows:

This Agreement shall commence to be effective on the date first shown above and shall remain in effect for an initial term of eighteen (18) months from the initial payment hereunder. The Agreement shall be renewable for an additional six (6) month term at the discretion of Licensee. In addition, either party may terminate the Agreement in the event that the other party commits a material breach of this Agreement, provided that the aggrieved party shall first notify the other party of the breach and give such other party at least ten (10) days to cure the breach.

2. The remainder of the Agreement shall continue in full force and effect as amended by the First Amendment to the Agreement previously executed by the parties and this Second Amendment.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

DIGITAL ENVOY, INC.                           GOOGLE, INC.

By:                                           By:

Authorized Signature                          Authorized Signature

Name: Rob Friedman                            Name: WAYNE ROSING
Title: EVP Corporate Development              Title: VP, ENGINEERING



# EXHIBIT / ATTACHMENT

## D

**(To be scanned in place of tab)**

Case 1:04-cv-00864-CAP   Document 5   Filed 04/16/2004   Page 28 of 65

**digital** ™
*e n v o y*

THIS RATIFICATION AGREEMENT (this "Agreement") is made and entered into as of the _1st_ day of January, 2003 (the "Effective Date"), by and between **Google Technology Inc.** ("Licensee") and **Digital Envoy Inc.** ("Licensor"):

### Background

1. Licensor and Licensee entered into a Product and Electronic Database Evaluation and License Agreement (the "Original Agreement") dated November 30, 2000, pursuant to which Licensee secured from Licensor the rights to use certain Products and Database Libraries (each as defined in that Original Agreement). Licensor and Licensee amended the Original Agreement with a First Amendment to the Product and Electronic Database Evaluation and License Agreement dated December 21, 2000 and a Second Amendment to the Product and Electronic Database Evaluation and License Agreement dated July 17, 2001 (collectively with the Original Agreement, the "Agreement").

2. The Agreement expired as of November 30, 2002. The parties now desire to reinstate the Agreement and the Agreement shall now continue in force as if the same had not expired; provided, however, that the parties desire to amend the Agreement with respect to certain terms, as set forth below.

3. The parties acknowledge that Licensee has continued to use the Product and the Database Libraries after the effective expiration of the Agreement and agree that Licensee paid to Licensor as full consideration for such continued usage a sum in the amount of US$4,500 in December 2002. The parties further acknowledge and agree that such usage by Licensee of the Product and the Database Libraries after the effective expiration of the Agreement shall be governed by and subject to the terms and conditions of the Agreement and Licensor hereby waives all claims that may now or hereafter be brought against Licensee in connection with such continued usage of the Product and the Database Libraries after the effective expiration of the Agreement.

### Terms

1. The first sentence of Section 5.1 of the Agreement shall hereby be amended to read as follows: "From January 2003 through the remainder of the term of this Agreement (including any extensions thereof), Licensee shall pay Licensor a monthly fee of eight thousand dollars ($8,000) per month during the term of this Agreement for access to Licensor's geographic targeting product (with information provided down to the metro-area) and connection-type, ISP and domain data bases."

2. The first two sentences of Section 9 of the Agreement shall be replaced with the following:

"This Agreement shall commence to be effective on the date first shown above and shall remain in effect for an initial term of twenty-four (24) months thereafter (i.e. from November 30, 2000 through November 29, 2002) (the "Initial Term"). Thereafter, this Agreement shall automatically renew for an additional term commencing on November 30, 2002 and ending on January 31, 2005 (the "First

1

GOOGLE CONFIDENTIAL

Renewal Term" and collectively with the initial Term, the "Term"). Licensee, in its discretion, shall have the option to extend the Agreement for an additional two (2) year term thereafter (the "Extended Term") by providing written notice to Licensor no later than thirty (30) days prior to the expiration of the Term.  Additionally, prior to the expiration of the Extended Term, Licensee, in its discretion, shall have the option to extend the Agreement for an additional one (1) year term by providing written notice to Licensor no later than thirty (30) days prior to the expiration of the Extended Term."

3. The remainder of the Agreement shall continue in full force and effect.

This Agreement may be executed in counterparts, including facsimile counterparts.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

DIGITAL ENVOY, INC.

By: _____ [Seal]
Authorized Signature

Name: Rob Freshan
Title: E. VP Corp. Dev.

GOOGLE TECHNOLOGY INC.

By: _____
Authorized Signature

Name: David Drummond
Title: VP Corporate Development



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIGITAL ENVOY, INC.,

        Plaintiff,

v.

GOOGLE, INC.,

        Defendant.

CIVIL ACTION NO. 1:04-CV-0864
(CAP)

## DECLARATION OF STEVEN SCHIMMEL

I, Steven Schimmel, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, depose and state as follows:

1.     My name is Steven Schimmel. I give this declaration of my personal knowledge in support of Defendant Google, Inc.'s ("Google") Motion to Dismiss or Transfer and Google's Response to Plaintiff's Emergency Motion for Expedited Discovery in Aid of Potential Motion for Preliminary Injunction in the above-captioned case, and for all other purposes authorized by law. I am more than 21 years of age and I suffer from no legal disability.

2.     I am Business Development Manager at Google and have been employed there since May 18, 1999. I work in the business development unit at Google and my responsibilities include negotiating contracts on behalf of the company.

1

3.    On November 30, 2000, Google and Plaintiff Digital Envoy, Inc. ("Digital Envoy") entered into a Product and Electronic Database Evaluation and License Agreement ("Agreement"). The Agreement was subsequently amended twice, on December 21, 2000 and July 17, 2001. After the Agreement, as amended, expired, it was reinstated with a Ratification Agreement dated January 1, 2003. Google and Digital Envoy have also entered into a Mutual Non-Disclosure Agreement, dated November 29, 2000.

4.    I was a key negotiator of the agreements and amendments identified in paragraph 3 of this Declaration on behalf of Google.

5.    The copies of the Agreement, First and Second Amendments, Ratification Agreement and Mutual Non-Disclosure Agreement attached to Google's Memorandum of Law in Support of its Motion to Dismiss or Transfer and to Google's Response to Plaintiff's Emergency Motion for Expedited Discovery in Aid of Potential Motion for Preliminary Injunction are true and accurate, to the best of my knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this /5.4 day of April, 2004, in Mountain View, California.

Steven Schimmel

2



# EXHIBIT / ATTACHMENT

$F$

**(To be scanned in place of tab)**



June 15 - 16, 2004 • New York, NY     INTERNET PLANET CONFERENCE & EXPO     Growing Business Onli

V O N A G E    –DUMPING MY OLD PHONE COMPANY WAS LIKE
THE BROADBAND PHONE COMPANY°     SIGNING MY OWN DECLARATION OF INDEPENDENCE.

www.clickz.com/news/article.php/2171611

# Google Teams With Ad Networks

By Brian Morrissey
March 28, 2003

Google has signed distribution deals with two ad networks, Burst Media and Fastclick, for its newly released content-targeted ad offering.

Just three weeks after unveiling the content-targeted ads, which serve paid listings on content pages, Google has signed deals with the two ad networks representing a total of 24,000 sites. The deals promise to help Google get a head start on rival Overture Services, which plans to release a similar offering sometime this year.

With content-targeted advertising, paid search firms hope to expand on the success of paid listings by posting them on non-search pages, particularly on content sites. Google uses its algorithmic search technology to scan content pages and determine relevant listings to serve. For example, a visitor to a sports page reading about the Boston Bruins game might see paid listings to the side for buying Bruins tickets or paraphernalia.

The deals promise Google distribution on thousands of middle-and lower-tier sites, such as Burst's FantasyCars.com and Fastclick's Webtoolcentral.com. Burst boasts 2,000 sites in its network, Fastclick 12,000. But the larger content sites remain the big catches, since they control the majority of spending on online advertising.

"Our members and customers are very excited to carry their business," said Jarvis Coffin, Burst Media's chief executive.

Yahoo!, which took in $140 million from its paid search partnership with Overture last year, and the other big portals, will remain the focus for distribution deals. While Yahoo! currently uses Google for algorithmic search, its acquisition of Inktomi has fueled speculation that it will dump Google as a partner.

At its analyst day this past January, Yahoo! said it planned to extend paid listings throughout the portal. Search executive Jeff Weiner said the company could easily serve up paid listings in its vertical areas, such as real estate.

When it unveiled the content-targeted AdWords program, Google announced a smattering of sites that would use the service, including HowStuffWorks.com, *San Jose Mercury News*, and Knight-Ridder Digital's properties.

Knight-Ridder Digital publishes the Web sites for dozens of newspapers, including *San Jose Mercury News*, *Detroit Free Press*, *Miami Herald*, and *Philadelphia Inquirer*.

Contextual ads are expected to build on the success of paid search, which in the past year has become the

hottest sector of the interactive marketing industry. Since entering the paid search business a year ago, Google has quickly established itself as an equal of the industry's former heavyweight, Overture. Analysts now estimate the two companies about split the paid listings traffic in the United States.

With paid search's success, keyword advertising has moved off the search page. For example, Overture has partnered with controversial adware supplier Gator for a test to serve up pop-under ads of paid listings to visitors of search sites.

Moving paid listings off the search page has a number of potential drawbacks. One is that putting paid listings on content pages could decrease their effectiveness, since readers have not come to the page to search.

Another, pointed to recently by a Knight-Ridder sales executive, is that content-page paid listings could conflict with an exclusive ad sale. For example, Knight-Ridder might have an exclusive deal with an airline on a site's travel pages. However, the content-targeted ads could serve up another airline's keyword pitch.

Coffin said there was no reason a content-targeted listing could not be just as effective as one on a search page.

"We'll see how well it works for them," he said. "I'm hopeful it will work well."

## Back to Article



The Premier Event for Search Engine Marketing & Optimization

- April 20 - 21, 2004 Tokyo, Japan
- May 11 - 12, 2004 Toronto, Canada
- June 2 - 3, 2004 London, England
- August 2 - 5, 2004 San Jose, CA
- October 27-28, 2004 Stockholm, Sweden
- December 13-16, 2004 Chicago, IL

How are we doing? Send us feedback!.
Having trouble? Tell us about technical questions or bug reports.
Let us know about newsletter problems or issues.

**JupiterWeb networks:**

 

**Search JupiterWeb:**                                              

Jupitermedia Corporation has four divisions:
JupiterWeb, JupiterResearch, JupiterEvents and JupiterImages

Copyright 2004 Jupitermedia Corporation All Rights Reserved.
Legal Notices, Licensing, Reprints, & Permissions, Privacy Policy.

Jupitermedia Corporate Info | Newsletters | Tech Jobs | E-mail Offers



# EXHIBIT / ATTACHMENT

G

**(To be scanned in place of tab)**

# GMail

## About Gmail

Gmail Home

Google Home

About Google

On this page: About Gmail | Frequently asked questions | Interested in an account?

## About Gmail

As part of Google's mission to organize the world's information and make it universally accessible and useful, we're testing an email service called Gmail.

Gmail is a free, search-based webmail service that includes 1,000 megabytes (1 gigabyte) of storage. The backbone of Gmail is a powerful Google search engine that quickly recalls any message an account owner has ever sent or received. That means there's no need to file messages in order to find them again.

When Gmail displays an email, it automatically shows all the replies to that email as well, so users can view a message in the context of a conversation. There are no pop-ups or banner ads in Gmail, which places relevant text ads and links to related web pages adjacent to email messages.

## Frequently asked questions

1. What makes Gmail different?
2. How much does Gmail cost?
3. How do I sign up? When can I get a Gmail account?
4. Is Gmail available in other languages?
5. What are Gmail's system requirements?
6. Does Gmail support automatic forwarding and POP3 access?
7. What about spam?
8. Are there ads in Gmail?
9. What is Gmail's privacy policy?
10. Why is Google offering email? I thought you were a search company.

### 1. What makes Gmail different?

Gmail uses Google search technology to automatically organize and find messages. And because Gmail includes 1,000 megabytes of storage, a typical user won't ever have to worry about deleting mail. Everything just gets archived so it can be found again if needed.

There are other differences in the way Gmail provides access to your email. For example, Gmail automatically groups an email and the replies to it as a conversation. That means you always see a message in its proper context. And there are no pop-ups or banner ads in Gmail, just relevant text ads and links to related pages. Gmail's other distinctive features include a labeling system, a spam reporter and a system for filtering your mail as it comes into your inbox. Learn more.

### 2. How much does Gmail cost?

Gmail is a free service and includes 1,000 megabytes of storage with each account. However, Gmail is still in preview mode as we test it to work out the kinks. So for now, it's not generally available.



### 3. How do I sign up? When can I get a Gmail account?

We're currently only offering Gmail as part of a preview release and limited test. We don't have details on when Gmail will be made more widely available, as that depends in part on the results of the test. If you're interested in receiving updates on Gmail, submit your email address using the form at the bottom of this page. And you can check out a sneak peek of Gmail here.

### 4. Is Gmail available in other languages?

During this testing period, the Gmail interface is only available in English. However, we're committed to making Gmail available to as many people in as many languages as possible. And Gmail accounts can already be used to read and send email in most languages (even Klingon).

### 5. What are Gmail's system requirements?

Gmail currently supports the following browsers:

- Microsoft IE 5.5 and newer (Windows)
- Netscape 7.1 and newer (Windows, Macintosh, Linux)
- Mozilla 1.4 and newer (Windows, Macintosh, Linux)
- Mozilla Firefox 0.8 and newer (Windows, Macintosh, Linux)

Regardless of the browser used, you must have JavaScript and cookies enabled. We hope to expand this list of supported browsers in the near future. To get updates on our progress with Gmail, add your email address using the form at the bottom of this page.

### 6. Does Gmail support automatic forwarding and POP3 access?

Not at the moment, but Google believes in helping people access information whenever and however they want to do so. In the future you will be able to access Gmail messages from non-Gmail accounts for free or at a nominal fee.

### 7. What about spam?

Google is committed to keeping unwanted messages out of your inbox. Gmail includes a sophisticated spam filter that we're continuing to improve. The Report Spam link in Gmail is a way for users to help with this effort. It removes spam from the inbox and sends valuable data to the Gmail team working on spam blocking.

### 8. Are there ads in Gmail?

There are no pop-ups or banner ads in Gmail. Like Google search results pages, Gmail does include relevant text ads on the right side of the page. The matching of ads to content is a completely automated process performed by computers. No humans read your email to target the ads, and no email content or other personally identifiable information is ever provided to advertisers.

Ads are matched using the same technology that powers the Google AdSense program, which already places targeted ads on thousands of sites across the web by quickly analyzing the content of pages and determining which ads are most relevant to them. Here's a sneak peek of how ads look in Gmail.



**9. What is Gmail's privacy policy?**

Google respects our users' privacy. For details, please read our email privacy policy.

**10. Why is Google offering email? I thought you were a search company.**

Google's mission is to organize the world's information and make it universally useful and accessible. For many people, email contains valuable information that can be difficult to retrieve. We believe we can help with that.

Gmail uses Google search technology to find messages so users don't have to create folders and file their individual emails. Many of Gmail's other features also incorporate search technology to improve their effectiveness. Used this way, search enhances the efficiency of email, so we believe it's a natural area for Google to offer a service.

## Interested in an account?

As we're in a testing period, we don't have more details for when Gmail will be made widely available, but we thank you for your interest in Gmail. In the meantime, if you'd like to be updated about Gmail, feel free to submit your email address below. We will only use your email to send you more information about Gmail. It will not be shared with any third parties.

Email address: [ _____ ]    [ Submit ]

©2004 Google - Gmail Home - Privacy Policy - Program Policies - Terms of Use - Google Home



# EXHIBIT / ATTACHMENT

## H

**(To be scanned in place of tab)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIGITAL ENVOY, INC.,

        Plaintiff,

v.

GOOGLE, INC.,

        Defendant.

CIVIL ACTION NO. 1:04-CV-0864
(CAP)

## DECLARATION OF MICHAEL TSAO

I, Michael Tsao, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, depose and state as follows:

1.    My name is Michael Tsao. I give this declaration of my personal knowledge in support of Defendant Google Inc.'s ("Google") Response to Plaintiff's Emergency Motion for Expedited Discovery in Aid of Potential Motion for Preliminary Injunction in the above-captioned case and for all other purposes authorized by law. I am more than 21 years of age and I suffer from no legal disability.

2.    I am a Software Engineer at Google and have been employed there since December 2003. I am an engineer on the Gmail project.

3.    I am familiar with Google's Gmail service and how the advertisements displayed on Gmail are selected. Google does not use Digital

1



# EXHIBIT / ATTACHMENT

I

**(To be scanned in place of tab)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIGITAL ENVOY, INC.,

       Plaintiff,

v.

GOOGLE, INC.,

       Defendant.

CIVIL ACTION NO. 1:04-CV-0864
(CAP)

## DECLARATION OF DAVID H. KRAMER

    I, David H. Kramer, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, depose and state as follows:

    1.    My name is David H. Kramer.  I am a partner at Wilson Sonsini Goodrich & Rosati, outside counsel for Defendant Google, Inc. ("Google").  I give this declaration of my personal knowledge in support of Google's Motion to Dismiss or Transfer and Google's Response to Plaintiff's Emergency Motion for Expedited Discovery in Aid of Potential Motion for Preliminary Injunction in the above-captioned case, and for all other purposes authorized by law.  I am more than 21 years of age and I suffer from no legal disability.

    2.    On or about April 6, 2004, I telephoned Timothy Kratz, counsel for Digital Envoy in this matter.  The day before, Mr. Kratz had directed an inquiry to Google concerning Google's newly-announced electronic mail service known as

1

Gmail. Specifically, Mr. Kratz had asked Google to explain whether it was using Digital Envoy's technology in connection with the Gmail service.

3.    I expressly informed Mr. Kratz during our call on April 6 that Google was not, in fact, using Digital Envoy's technology in connection with Gmail.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _/5_ day of April, 2004, in Palo Alto, California.

David H. Kramer

1757581v1



# EXHIBIT / ATTACHMENT

## J

**(To be scanned in place of tab)**

COPY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAR 29 2004

LUTHER D. THOMAS, Clerk
By:
Deputy Clerk

DIGITAL ENVOY, INC.          )
                             )
        Plaintiff            )
                             )
vs.                          )     CIVIL ACTION: 1:04-CV-0864
                             )
GOOGLE, INC.                 )     JURY TRIAL REQUESTED
                             )
        Defendant            )
_____)

## COMPLAINT

Plaintiff Digital Envoy, Inc. ("Digital Envoy"), for its Complaint against Defendant Google, Inc. ("Google"), respectfully shows the Court the following:

### *Summary of Complaint*

1.     Digital Envoy brings this action because Google is using Digital Envoy's technology in non-permitted ways. Digital Envoy seeks to recover for Google's wrongful use of Digital Envoy's technology which helped grow Google's business at a phenomenal rate without Google properly compensating Digital Envoy. Digital Envoy is the inventor and market leader in IP Intelligence technology which enables the determination of the geographic location of any computer hooked to the Internet by reliably and rapidly tracking protocol addresses.

2.      In November 2000, Digital Envoy and Google entered into an

agreement permitting Google to use Digital Envoy's technology for limited

uses. At the beginning of this business relationship, Google properly used

the technology on its search site for a variety of purposes, including selling

what is referred to by Google as "paid links" (or links directly related to a

user search on Google.com which are paid for by third parties who want to

highlight their products to users and are highlighted as such on Google.com).

3.      Later, Google expanded its business model and began to service non-

search related advertising on third party sites and sell geographically

targeted advertising on those sites — using Digital Envoy's technology

outside the scope of the license and without compensating Digital Envoy.

From this wrongful conduct, Google has built a vast and profitable online

advertising business (which is a $7.2 billion/year industry and growing), and

Digital Envoy has lost substantial income opportunities. Digital Envoy

brings this action to recover its lost income, to disgorge Google from its

wrongful income, to prevent Google from further wrongful conduct, and to

recover additional damages as provided by law.

## Parties, Jurisdiction and Venue

4.      Digital Envoy is a Georgia corporation with its principal place of

business in Norcross, Georgia. The company was formed in October 1999

by the inventors of the technology which is the subject of this action and others.

5.    Google, Inc. is a California corporation with its principal place of business at its "Googleplex" in Mountain View, California. In August 2003, Google registered as a foreign profit corporation with the Secretary of State of Georgia. Its registered agent for service of process in Georgia is Corporation Service Company, 40 Technology Pkwy South, #300, Norcross, Georgia 30092.

6.    Google is subject to the jurisdiction of this Court pursuant to Georgia's Long-Arm Statute, O.C.G.A. § 9-10-91 in that Google transacts business within Georgia, has committed a tortious act or omission within Georgia, has committed a tortious injury in Georgia which was caused by actions or omission outside of Georgia and Google regularly does or solicits business and derives substantial revenue from services rendered in Georgia, and owns, uses or possesses real property situated in Georgia.

7.    This Court has jurisdiction over this dispute under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different States. Digital Envoy is a citizen of the State of Georgia and Google is a citizen of the State of California. This Court also has jurisdiction over this dispute

under 28 U.S.C. § 1331 in that this action arises, in part, under the laws of

the United States and the remainder of the claims are subject to the

supplemental jurisdiction of this Court under 28 U.S.C. § 1367.

8.      Venue is proper in this District and Division under 28 U.S.C. § 1391

in that a substantial part of the events or omissions giving rise to the claim

occurred and a substantial part of the property that is the subject of the

action is situated in this district and division.

### Factual Allegations

#### Digital Envoy and its Technology

9.      Digital Envoy invented and developed technology ("IP Intelligence")

which essentially delivers specific information about a visitor to a website,

including: geographic location down to the closest city, connection speed

and, in some cases, the industry in which the visitor works.

10.     IP Intelligence represents a substantial breakthrough in Internet

technology.  The Internet contains more than 4 billion IP addresses, which

incorporate no geographical information.  Furthermore, IP addresses are

assigned in random order, providing no logical associations based on the

numbers.  Digital Envoy's proprietary technology essentially maps the

Internet's ever changing topology and overlays a geographical map which

allows the technology to tie an IP address to a geographic location.  Digital

Envoy has applied for a patent covering certain aspects of its technology and has received favorable indication from the Patent and Trademark Office.

11.    Digital Envoy delivers the information obtained through IP Intelligence with industry-leading reliability and virtually instantaneous speed which is essential for the practical uses of this information.

12.    Digital Envoy's customers benefit from this information in a variety of ways, such as permitting the assemblage of basic market data, enabling the website to publish its content in the visitor's language, enhancing security and enabling geographically targeted advertising.

13.    IP Intelligence also provides a superior manner of collecting this basic information, which otherwise would be obtained through the use of privacy-invading "cookies" or intrusive user questionnaires, either of which are more susceptible to abuse.

14.    Digital Envoy's simple business model is predicated upon receiving payment for its customers' fair use of this limited information. Accordingly, its customers are restricted in their use of this information, such that it is not readily made available to third parties, except when expressly permitted in an agreement which fairly compensates Digital Envoy. These restrictions are necessary to not foreclose Digital Envoy's business opportunities (either directly or indirectly) to do business with third party web sites directly.

15.    Digital Envoy's proprietary technology has significant and
independent economic value to Digital Envoy because it is unique, and not
generally known to, or readily ascertainable by proper means, by other
persons who could obtain economic value from the use or disclosure of this
technology.  Furthermore, since the value of Digital Envoy's IP Intelligence
technology is the delivery of information, the company takes reasonable
measures to protect the unauthorized distribution of this information.
Specifically, without limitation, Digital Envoy restricts its customers for
*specific licensed uses and transmits the information (known as Digital
Envoy's "Database Library")* in encrypted binary format.

16.    One of the most profitable uses of Digital Envoy's IP Intelligence
technology is to enable its users to geographically target advertising on their
website.  By instantaneously obtaining the geographical location of a visitor
down to the closest city, the customer can target specific advertising relevant
to the visitor.

17.    The ability to target advertising in this matter is attractive to
advertisers reluctant to buy Internet advertising which would otherwise be
sent all over the world.  Digital Envoy's customers can thus sell more
advertising, and the advertising is more successful and thereby more
profitable to the customer since Internet advertising is often paid on a click-

through basis, meaning the advertiser pays when a computer user actually

clicks on the advertisement. Since geographically targeted advertising is

more relevant to the customer's visitors, the "click-through rate" (or

whatever other measure of success of the ad is employed) is often higher

than un-targeted advertising.

18.    By filling this niche, Digital Envoy has developed into a small but

profitable and growing business.

### Google Background

19.    Google is an Internet search engine company formed in September

1998.  Through excellent technological innovations and strong financial

backing, Google became the world's largest search engine in mid-2000.

20.    Google is a play on the word "googol" which refers to the number

represented by the number 1 followed by 100 zeros.  Google's use of the

term reflects the company's mission to organize the immense, seemingly

infinite amount of information available on the web.

21.    Google portrays itself as having started with a couple of students with

an innovative idea who opened its door in an office attached to a garage of a

friend.  The Googleplex, as Google's present world headquarters is known,

is (or was) complete with lava lamps, roving large dogs, a chef who is a

Dead-head (a fan of the musical group, the Grateful Dead), and room in the

parking lot for twice-weekly roller hockey games. Google claims it is
working on offering searches in the fictional Klingon language from the
television show StarTrek.

22.    At the same time, Google is backed by funding from two leading
venture capital firms and has a management team, board of directors and
technical advisory council that rivals any company in the world for business
and financial acumen. Its two founders have also just joined *Forbes'*
billionaire club. Google also exceeded $1 billion in revenue in 2003, mostly
from advertising, and the company is valued at more than $15 billion.

23.    As with many Internet-based companies, Google did not make a profit
in its first three years. Google's principal source of income originally came
from marketing its search technology to other Internet-based companies. At
the same time, Google offered limited "paid link" opportunities on its
website. However, as described below, Google soon began to expand its
business from pure search into advertising and the company soon thereafter
achieved elusive *profitability*.

### The Agreement between Google and Digital Envoy

24.    Google's "paid link" program began in mid-2000 and was originally
centered on the ability to offer paid links or relevant information tied to a
user's search request. Thus on its site, through keyword targeting or "paid

links", only those users who are actively conducting a web search and requesting information related to a third party's product are shown that third party's message. The third party pays Google for its placement of its "paid link" on Google.com.

25. Google recognized that one factor in the relevance of paid links is geography. Accordingly, shortly after it began its paid link program, Google was attracted to Digital Envoy's technology which would permit paid link results which was geographically targeted to its audience.

26. In November 2000, Google and Digital Envoy began to negotiate a license agreement whereby Google would have use of Digital Envoy's IP Technology to obtain the geographic location of visitors to its website, presumably to publish Google's site text in the visitor's language without prompt and to sell geographically targeted "paid links" on its website.

27. On November 30, 2000, Google and Digital Envoy entered into a Product and Electronic Database Evaluation and License Agreement (the "Agreement").

28. Under the Agreement, Google obtained a strictly limited, non-exclusive right to use Digital Envoy's IP Intelligence technology and Database Libraries only in Google's business of producing and maintaining *information search* technology and for no other business purpose (emphasis

added). Additionally, Google is expressly prohibited from selling, licensing, distributing, sharing or otherwise giving, *in any form*, the Database Libraries to any other party or using it outside of Google's site.

29. Under the Agreement, Digital Envoy retained all ownership of the Database Libraries, including any patents, copyrights or trade secrets associated with the Database Libraries of its IP Intelligence technology. Google is also obligated under this Section to hold all of Digital Envoy's product information in strict confidence and is prohibited from sharing such information with any third parties, and from distributing, disclosing or *otherwise making available* the Database Libraries, or any information contained therein to any other party whatsoever.

30. Google is also obligated under the Agreement to promptly notify Digital Envoy of any possible infringement of Digital Envoy's rights in the Database Libraries.

31. For the use of Digital Envoy's IP Intelligence technology, including the Database Libraries, Google pays to Digital Envoy a flat monthly fee, originally $3,000 during the evaluation period and currently $8,000 per month.

*Google's use of Digital Envoy's technology*

32.    Google used Digital Envoy's IP Intelligence technology to enable geographically targeted paid links, solely in conjunction with a user search, on its information search technology website.  Such targeting fit well with Google's business program and was incorporated into Google's promotional materials directed to potential third party paid link purchasers on its website.

33.    Google's paid link program as well as its third party ad network program, as it is directed to outside companies on Google's search site, is called "AdWords" by Google.  Google also has a Premium Sponsorship program for large participants to negotiate a specific agreement with Google. Companies signing up to use paid links through the AdWords program pay Google based on cost-per-click such that Google benefits financially when advertisements placed by Google are "clicked" on by the visitor to the site.

34.    To enhance the "click through rate", companies signing to obtain paid links and to participate in the Google Ad Network through the AdWords program are offered the option to geographically target their link.  In fact, the first of the four steps required to sign up for the Google AdWords program requests the advertiser to choose its geographic targets, which, unless "All Countries" and "All Languages" are chosen, requires use of Digital Envoy's technology.

35.    The Premium Sponsorship paid link and ad network program is also based on the success of the paid link or advertisement, measured by the click through rate or some other measure, and also permits geographic targeting.

36.    At the time of the Agreement, Google had just begun to sign agreements with other Internet companies to power search services on those companies' sites. However, Google did not supply advertising services to third party web sites at that time, had not contemplated providing such services and did not disclose to Digital Envoy its intention to enter into this business. Instead Google's business at the time was solely related to information search.

37.    On the strength of Google's targeted paid link program, which included Regional Targeting using Digital Envoy's IP Intelligence, Google had signed up more than 350 Premium Sponsorships and thousands of AdWords participants by mid-2001. Due to Google's targeted paid link program on Google.com, its click through rates at that time were four to five times higher than click through rates for traditional advertisement programs.

*Google's misuse of Digital Envoy's technology*

38.    By August 2002, Google began to enter into agreements to provide Google advertisements (including advertisements developed under its

AdWords program) on third party websites to which it was providing search services.

39.    In February – March, 2003, Google began to syndicate advertisements to major advertising networks supporting nearly 24,000 websites.  Google announced that it entered into this arrangement as part of a test of a new service to place text ads on pages selected for their relevance to a marketer's products or services.  Thus, for the first time, Google announced plans to place cost-per-click listings on content-targeted websites, rather than search-related pages.  Google advertisers, including the more than 100,000 active advertisers in its Google AdWords program, would thereafter have the option to appear on websites unrelated to search.   Google's business thus was expanding outside of information search.

40.    In May – June 2003, Google launched a new program which it called "Google AdSense" wherein Google would supply advertisements to any content-based website which signed up.  Google announced that the program was designed to maximize the revenue potential of a website by serving highly relevant ads specific to the content of the page.  Under this program, Google and the AdSense client share in revenue paid by the advertisers, typically on a per click basis or some other measure of the success of the advertisement on the AdSense client's website.  Google's

initial clients in the AdSense program included ABC.com, HowStuffWorks, Internet Broadcasting Systems, Inc., Lycos Europe, New York Post Online Edition, Reed Business Information and U.S. News & World Report. Google refers to third party web sites in its AdSense program and the delivery of advertisements on such sites, as the "Google Ad Network."

41.    As part of the service it provides to its clients, Google uses Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted, non-information search related, advertisements on those third party websites in the "Google Ad Network". Such use is beyond the scope of the Agreement between Google and Digital Envoy. Google did not obtain authorization from Digital Envoy to make such use and did not, in fact, tell Digital Envoy that it was doing so.

42.    Due in large part to the strength of its AdSense program, Google more than doubled its revenues from 2002 to 2003, and the trend continues upward in 2004. Google specifically makes substantial income and profit from the placement of geographically targeted, non-information search related, advertisements on its client's websites in the Google ad network.

43.    At the same time, Digital Envoy has received no income from Google's unauthorized use of Digital Envoy's proprietary technology, but instead has lost significant licensing opportunities.

- 14 -

44. In February 2004, Digital Envoy notified Google that it considered Google's use of Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted advertising on third party websites to be unauthorized under the Agreement. Google admitted to its conduct but refused to stop. Instead, in response to Digital Envoy's inquiry, Google offered to increase its payment under the Agreement to $12,000 per month. Digital Envoy rejected this offer because it fell woefully short of the income enjoyed by Google and the lost income to Digital Envoy as a result of Google's unauthorized conduct.

### Count I
### (Misappropriation of Trade Secrets)

45. Digital Envoy incorporates its allegations contained in paragraphs 1 through 44 as if fully stated herein.

46. Digital Envoy's IP Intelligence and its Database Libraries are trade secrets, protected by law.

47. Although acquired by lawful means, Google's misuse of Digital Envoy's trade secrets constitutes a misappropriation in that it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use and that Google used Digital Envoy's trade secrets through improper means.

48.   Google's misappropriation of Digital Envoy's trade secrets have damaged Digital Envoy through lost income, licensing and other business opportunities.

49.   Google's misappropriation of Digital Envoy's trade secrets have also unjustly enriched Google.

50.   Digital Envoy is entitled to recover damages against Google in amounts to be proved at trial.

51.   Google's actions have been willful and malicious.  Accordingly, Digital Envoy is entitled to recover punitive damages against Google in amounts to be determined by the enlightened conscience of the jury.

## COUNT II
### (Federal Unfair Competition)

52.   Digital Envoy incorporates its allegations contained in paragraphs 1 through 51 as if fully stated herein.

53.   Google's actions, as set forth above, made in connection with services and used in commerce, falsely designate the origin of its services, are misleading in their description or representation of fact.  Google's actions deceive others (including its AdSense and AdWords customers) as to the origin and approval of its services and its commercial activities and Digital Envoy is damaged by this conduct.  Google's actions thus constitute violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

54.    Google acted as set forth above with knowledge and in disregard of Digital Envoy's rights.

55.    Digital Envoy is entitled to recover its actual damages, Google's profits, treble damages and its attorneys' fees.

56.    In the manner set forth above, Google has also irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

## Count III
## (Unfair Competition under Georgia Law)

57.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 56 as if fully stated herein.

58.    As set forth above, Google has engaged, and is continuing to engage in acts of unfair competition in violation of O.C.G.A. § 10-1-372.

59.    Google acted as set forth above with knowledge and deceit and in disregard of Digital Envoy's rights and has caused Digital Envoy actual damages.

60.    In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

61.    Digital Envoy is thereby entitled to recover its attorneys' fees from Google.

- 17 -

## COUNT IV
## (Common Law Unfair Competition)

62.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 61 as if fully stated herein.

63.    The actions of Google set forth above constitute unfair competition in violation of common law in that:

(a)    the actions enable Google to obtain the benefit of, and trade on, the goodwill of Digital Envoy;

(b)    the actions by Google damage Digital Envoy in that Digital Envoy has no control over the business of Google;

(c)    the actions of Google are likely to cause, and have caused, confusion, mistake or deception; and

(d)    the actions of Google will result in the unjust enrichment of Google.

64.    Google acted as set forth above with knowledge, in bad faith and in willful disregard of Digital Envoy's rights.

65.    In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

66.    Digital Envoy is also entitled to an award of damages to be proved at trial, punitive damages and attorneys' fees.

- 18 -

## COUNT V
### (Common Law Unjust Enrichment)

67.     Digital Envoy incorporates its allegations contained in paragraphs 1 through 66 as if fully stated herein.

68.     As set forth above, Google has used and continues to use Digital Envoy's technology and information for purposes outside the scope of the Agreement.

69.     Google and Digital Envoy had no agreement or understanding which would govern the relationship of the parties for the extra-contractual use set forth above.

70.     In this manner, Google has received distinct and direct benefits from Digital Envoy, but without compensating Digital Envoy. Google has thereby been unjustly enriched.

71.     Accordingly, Digital Envoy is entitled to recover from Google all monies earned in connection with Google's extra-contractual use of Digital Envoy's proprietary technology and information, in amounts to be proved at trial.

WHEREFORE, Plaintiff Digital Envoy, Inc. prays for a trial by jury on all issues, judgment in its favor and against Defendant Google, Inc. for actual damages, disgorgement of profits, recovery of monies earned, treble

damages, punitive damages, attorneys' fees interest and costs, and for an injunction prohibiting Defendant Google, Inc. from using Digital Envoy's proprietary technology and information beyond the scope of the Agreement, specifically including supplying geographically targeted advertisements on third party websites.

Respectfully submitted this 29ᵗʰ day of March, 2004.

Timothy H. Kratz
Georgia Bar No. 429297
Luke Anderson
Georgia Bar No. 018330
John A. Lockett, III
Georgia Bar No. 455549

**McGuireWoods LLP**
1170 Peachtree Street, NE
Suite 2100, The Proscenium
Atlanta, Georgia 30309-1234
Telephone: (404) 443-5730
Facsimile: (404) 443-5784

Attorneys for Plaintiff
Digital Envoy, Inc.