

FILED IN CLERK'S OFFICE
APR 1 5 2004
LUTHER ... Clerk
By: F. Fuckhut Deputy Clerk
ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIGITAL ENVOY, INC.,

   Plaintiff,

v.

GOOGLE, INC.,

   Defendant.

CIVIL ACTION NO. 1:04-CV-0864 (CAP)

## DEFENDANT'S MOTION TO DISMISS OR TRANSFER

Pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, Defendant Google Inc. ("Google") moves to dismiss this action on the grounds that venue does not properly lie in this jurisdiction. The instant dispute arises out of a contract that includes an explicit and enforceable forum selection clause requiring any lawsuit regarding the contract to be filed in the state or federal courts of Santa Clara County, California. Hence, this case should be dismissed because venue is improper.

Should this Court deem more appropriate to transfer this case than to dismiss it, then this Court should transfer the case to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a). In support of this Motion, Defendant submits its accompanying memorandum of law, which is

1754616v1

incorporated herein, as well as the Declaration of Steven Schimmel.

Dated this 16th day of April, 2004.

OF COUNSEL:

David H. Kramer
WILSON SONSINI GOODRICH &
ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: 650.493.9300
Facsimile:  650.493.6811

By: _____
Stephen M. Dorvee, Bar No. 226989
Scott E. Taylor, Bar No. 785596
Adam Gajadharsingh, Bar No. 266978
ARNALL GOLDEN GREGORY LLP
2800 One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3450
Telephone: 404.873.8500
Facsimile: 404.873.8501

Attorneys for Defendant
Google, Inc.

- 2 -

## CERTIFICATE OF SERVICE

I do hereby certify that the foregoing **_Defendant's Motion to Dismiss or Transfer_** was served by United States mail, first-class, with postage attached to:

> McGuire Woods LLP
> Timothy H. Kratz, Esq.
> Luke Anderson, Esq.
> John A. Lockett, III, Esq.
> 1170 Peachtree Street, NE
> Atlanta, Georgia 30309-1234

This is to certify, pursuant to Local Rule 7.1(D), that the font and point size, Times New Roman 14, used in this brief comply with Local Rule 5.1(D).

This 16th day of April, 2004.

Adam Gajadharsingh

FILED IN CLERK'S OFFICE

APR 1 6 2004

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIGITAL ENVOY, INC.,

      Plaintiff,

v.

GOOGLE, INC.,

      Defendant.

CIVIL ACTION NO. 1:04-CV-0864
(CAP)

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS OR TRANSFER

### Introduction

Plaintiff Digital Envoy, Inc.'s ("Digital Envoy's") Complaint must be dismissed or transferred because, per the forum selection clause in the parties' agreement at the heart of the case, venue does not properly lie in this Court. Digital Envoy has attempted to evade the forum selection clause by asserting causes of action sounding in tort rather than contract. But the law does not countenance such transparent machinations.

The contract clause in question requires any claim regarding the contract to be venued in Santa Clara County, California. As Digital Envoy's Complaint makes clear, this entire case concerns the contract – specifically, the parties dispute

whether Defendant Google Inc. ("Google") has used Digital Envoy's technology beyond the scope of the license granted Google in the parties' contract. Per the parties' agreement, that dispute must be resolved in California. Accordingly, Plaintiff's Complaint must be dismissed or transferred on improper venue grounds.

### Statement of Facts

Google and Digital Envoy are parties to two separate contracts, each of which requires that disputes relating to those agreements be litigated in California. The first of these contracts, a November 29, 2000 non-disclosure agreement (the "NDA," a copy of which is attached hereto as Exhibit A), was to cover all confidential information exchanged by the parties. It provides that: "The exclusive venue for any dispute relating to this Agreement shall be in the state or federal courts within Santa Clara County, California.

With the NDA in place, the parties negotiated a second agreement under which Google was licensed to use Digital Envoy's geo-targeting technology (the "License Agreement" a copy of which is attached hereto as Exhibit B). Like the NDA, the License Agreement provides that **"[a]ny lawsuit regarding this Agreement shall be filed in the state or federal courts in Santa Clara County, California."** Agreement at § 12.[1]

---

[1]    The parties subsequently amended their Agreement twice, on December 21, 2000 and

1754687v1

In February of this year, Digital Envoy began to dispute the scope of Google's rights under the License Agreement. Specifically, Digital Envoy has contended that Google has used Digital Envoy's technology beyond the scope of the license granted in the License Agreement. Google disagrees, and has maintained that its activities are entirely covered by the License Agreement.

The parties' dispute over the scope of Google's rights under the License Agreement was brought to a head on March 29, 2004, when Digital Envoy filed this action against Google. The Complaint alleges: (1) misappropriation of trade secrets; (2) federal unfair competition; (3) unfair competition under Georgia law; (4) common law unfair competition; and (5) common law unjust enrichment – all of which derive from Plaintiff's core allegation that "Google is using Digital Envoy's technology in non-permitted ways," *i.e.*, in ways not permitted under the terms of the License Agreement. Compl. at ¶ 1, a copy of which is attached hereto as Exhibit G. Indeed, the Complaint is rife with references to the License Agreement. For example:

- "In November 2000, Google and Digital Envoy began to negotiate a

---

July 17, 2001. The First and Second Amendments are attached hereto as Exhibits C and D respectively. The Second Amendment states that the remainder of the Agreement "shall continue in full force and effect" as amended. See Exhibit D at ¶ 2. By virtue of a Ratification Agreement dated July 1, 2003, the parties extended the term of the Agreement through, at a minimum, January 31, 2005. See Exhibit E. The Declaration of Steven Schimmel, attached hereto as Exhibit F, affirms that Exhibits A-E are true and accurate copies of the documents.

1754687v1

license agreement...." (Id. at ¶ 26);

- "On November 30, 2000, Google and Digital Envoy entered into a Product and Electronic Database Evaluation and License Agreement (the 'Agreement')." (Id. at ¶ 27);

- "Under the Agreement, Google obtained a strictly limited, non-exclusive right to use Digital Envoy's IP Intelligence technology and Database Libraries...." (Id. at ¶ 28);

- "Under the Agreement, Digital Envoy retained all ownership of the Database Libraries.... Google is also obligated under this Section to hold all of Digital Envoy's product information in strict confidence...." (Id. at ¶ 29);

- "Google is obligated under the Agreement to promptly notify Digital Envoy of any possible infringement of Digital Envoy's rights in the Database Libraries." (Id. at ¶ 30);

- "At the time of the Agreement, Google had just begun to sign agreements with other Internet companies to power search services on those companies' sites." (Id. at ¶ 36);

- "Such use is beyond the scope of the Agreement between Google and Digital Envoy." (Id. at ¶ 41);

- "In February 2004, Digital Envoy notified Google that it considered Google's use of Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted advertising on third party websites to be unauthorized under the Agreement." (Id. at ¶ 44); and

- "As set forth above, Google has used and continues to use Digital Envoy's technology and information for purposes outside the scope of the Agreement." (Id. at ¶ 68).

All of the claims alleged in the Complaint hinge on one question: Has

Google acted in a manner that is impermissible under the terms of the Agreement?

To address those claims, a court will necessarily be required to construe the License Agreement and determine the scope of license granted Google. Per the parties' License Agreement, the only courts where disputes regarding the License Agreement may be heard are in Santa Clara County, California.[2] Therefore, venue does not properly lie in this Court.

## Argument

**I. THE CONTRACT'S FORUM SELECTION CLAUSE REQUIRES THAT PLAINTIFF'S CLAIMS BE DISMISSED OR TRANSFERRED BECAUSE THE CLAIMS ARISE OUT OF THE PARTIES' CONTRACT.**

Pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, Plaintiff's claims should be dismissed for improper venue. See Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1290 (11th Cir. 1998) (holding that motions to dismiss based upon forum selection clauses are properly brought under Rule 12(b)(3) as motions to dismiss for improper venue).[3] The parties' Agreement

---

[2]    On April 16, 2004, Google filed an action against Digital Envoy for breach of the License Agreement and declaratory judgment in the Northern District of California. Google seeks, *inter alia*, (1) a declaration that it has not used Plaintiff's technology beyond the scope of license provided by the Agreement, and (2) that Plaintiff has breached the Agreement by filing the instant action in violation of the forum selection clause. Google filed the action in California because that is the only permitted venue for its claims in light of the forum selection clause in the License Agreement.

[3]    Alternatively, this Court may find that Plaintiff's claims should be transferred, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Northern District of California. In P&S Business Machines, Inc. v. Canon USA, Inc., 331 F.3d 804 (11th Cir. 2003), the court noted that the factors for evaluating a Section 1404(a) transfer are the convenience of parties and

1754687v1

includes an explicit, valid and enforceable forum selection clause requiring that "[a]ny lawsuit regarding [the] Agreement shall be filed in the state or federal courts in Santa Clara County, California." A contractual forum selection clause is presumptively valid unless enforcement would be unreasonable, and the party resisting enforcement has the burden of showing that the clause is invalid. See The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10-12, 92 S. Ct. 1907, 1913-14, 32 L. Ed. 2d 513, 521-22 (1972); see also Carnival Cruise Lines v. Shute, 499 U.S. 585, 593-94, 111 S. Ct. 1522, 113 L. Ed. 2d 622 (1991) (contractual forum selection clause barred adjudication of tort claims in another forum).[4]

Digital Envoy cannot seriously contend that this action is not one "regarding" the License Agreement. Even a cursory reading of the Complaint refutes such a contention. The entire case depends upon its allegation that Google has used Digital Envoy's technology beyond the scope of license granted in the

---

witnesses and the interests of justice. The Eleventh Circuit emphasized, however, that "while other factors might 'conceivably' militate against a transfer...the venue mandated by a choice of forum clause rarely will be outweighed by other 1404(a) factors." Id. at 807 (citation omitted).

[4]    See also IERO v. Mohawk Finishing Products, Inc., 243 Ga. App. 670, 671, 534 S.E.2d 136, 138 (2000) (forum selection clauses should be enforced "absent a compelling reason such as 'fraud, undue influence, or overweening bargaining power'") (quoting Bremen); Carnival Cruise Lines, 499 U.S. at 593-94, 111 S. Ct. at 1527, 113 L. Ed. 2d at 632 (forum selection clauses serve the salutary purpose of "dispelling any confusion about where suits arising from the contract must be brought and defended, sparing litigants the time and expense of pretrial motions to determine the correct forum and conserving judicial resources that otherwise would be devoted to deciding those motions").

1754687v1

License Agreement. And that License Agreement consigns any dispute about the scope of the agreement to the California courts.

Plaintiff will no doubt argue that, because it has not expressly pled a breach of contract claim regarding the License Agreement, the forum selection clause does not control. That contention has been squarely rejected in case after case, where, as here, the claims in the suit directly concern the agreement. The Eleventh Circuit has spoken directly on the subject, holding that contractual forum selection clauses govern not only contractual claims, but also tort claims "arising directly or indirectly from the business relationship evidenced by the contract." Stewart Organization, Inc. v. Ricoh Corp., 810 F.2d 1066, 1070 (11th Cir. 1987) (en banc), aff'd and remanded on other grounds, 487 U.S. 22, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988); Terra Int'l v. Mississippi Chem. Corp., 119 F.3d 688, 695 (8th Cir. 1997) (forum selection clause applied to tort claims where the plaintiff "plainly could have asserted a parallel claim for breach of contract.... The same exact facts surrounding Terra's tort claims would also give rise to a breach of contract claim.")

Georgia state courts are in accord. In Brinson v. Martin, 220 Ga. App. 638, 469 S.E.2d 537 (1996), the plaintiff filed suit against his former employer alleging breach of contract, and against employees of the company alleging interference

- 7 -

with economic relations and unjust enrichment. The employment contract between the plaintiff and his former employer had a forum selection clause stating that the venue for any legal proceeding arising out the contract would be Douglas County, Nebraska. Despite this provision, the plaintiff brought suit in Georgia. The Georgia Court of Appeals soundly rejected the plaintiff's contention that the clause did not cover tort claims, noting that "despite Brinson's attempt to characterize his claims against Martin as falling outside the business relationship he had with Woodmen, it is clear from his complaint that the claims arose either directly or indirectly from his contract with Woodmen." Id. at 641, 469 S.E.2d at 540.

Similarly, in Cusano v. Klein, 196 F. Supp. 2d 1007, 1011 (C.D. Cal. 2002), the court recounted that tort claims against one defendant had previously been ordered transferred to New York. The plaintiff and that defendant had entered into a contract that stated that "New York courts, only, will have jurisdiction of any controversies regarding this Agreement." Id. Because resolution of the tort claims required "interpretation of the March 18, 1992 agreement and a decision as to whether the agreement has been repudiated," those claims could only be adjudicated in New York. Id.; see also Peridyne Tech. Solutions, LLC v. Matheson Fast Freight, Inc., 117 F. Supp. 2d 1366, 1372 (N.D. Ga. 2000) (relying in part on a Georgia choice of forum clause in denying motion to dismiss tort

- 8 -

claims); Picken v. Minuteman Press Int'l, Inc., 854 F. Supp. 909 (N.D. Ga. 1993) (forum selection clause applying to "litigation... hereunder" encompassed tort claims); Stephens v. Entre Computer Centers, Inc., 696 F. Supp. 636, 638 (N.D. Ga. 1988) (rejecting argument that a contractual forum selection clause did not apply to tort claims); Banco Popular de Puerto Rico v. Airborne Group PLC, 882 F. Supp. 1212, 1213-17 (D.P.R. 1995); Warnaco Inc. v. VF Corp., 844 F. Supp. 940, 947-49 (S.D.N.Y. 1994); Nat'l Micrographics Sys., Inc. v. Canon U.S.A., Inc., 825 F. Supp. 671, 677-78 (D.N.J. 1993).

Here, Digital Envoy's Complaint makes clear that its supposed damages are a result of Google allegedly acting beyond the scope of (*i.e.* breaching) the parties' License Agreement. If Google is acting within its rights under the Agreement, then Digital Envoy has no claim. Under the circumstances, this Court must enforce the forum selection clause of the License Agreement and either dismiss this case, or transfer it to the federal court having jurisdiction of Santa Clara County, California (the Northern District of California).[5]

---

[5]    Digital Envoy's claims, all of which concern alleged misuse of its confidential information by Google, also appear to "relate" to the NDA Agreement between the parties. But for the NDA, Google would have no confidentiality obligations to Digital Envoy. Since any claim "relating to" the NDA must also be filed in Santa Clara County, California pursuant to its forum selection clause, the NDA affords a second basis for concluding that the action here is improperly venued.

### Conclusion

Plaintiff's Complaint is an awkward attempt to pursue a breach of contract claim under the guise of tort claims in a transparent effort to avoid the forum selection clause contained in the Agreement. Such clauses are routinely upheld and enforced under circumstances such as those presented here. For the foregoing reasons, this Court should dismiss this action for improper venue or transfer this action to the United States District Court for the Northern District of California.

Dated this 16th day of April, 2004.

OF COUNSEL:

David H. Kramer
WILSON SONSINI GOODRICH &
ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: 650.493.9300
Facsimile: 650.493.6811

By: _____
Stephen M. Dorvee, Bar No. 226989
Scott E. Taylor, Bar No. 785596
Adam Gajadharsingh, Bar No. 266978
ARNALL GOLDEN GREGORY LLP
2800 One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3450
Telephone: 404.873.8500
Facsimile: 404.873.8501

Attorneys for Defendant
Google Inc.

- 10 -

1754687v1

## CERTIFICATE OF SERVICE

I do hereby certify that the foregoing *Defendant's Memorandum of Law in Support of Its Motion to Dismiss or Transfer* was served by United States mail, first-class, with postage attached to:

> McGuire Woods LLP
> Timothy H. Kratz, Esq.
> Luke Anderson, Esq.
> John A. Lockett, III, Esq.
> 1170 Peachtree Street, NE
> Atlanta, Georgia 30309-1234

This is to certify, pursuant to Local Rule 7.1(D), that the font and point size, Times New Roman 14, used in this brief comply with Local Rule 5.1(D).

This 16th day of April, 2004.

Adam Gajadharsingh

- 11 -

1754687v2



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

# Google

# Mutual Non-Disclosure Agreement

This Mutual Non-Disclosure Agreement ("Agreement") is made and entered into between Google, Inc., for itself and its subsidiaries and affiliates ("Google"), and Digital Envoy, Inc., for itself and its subsidiaries and affiliates ("Participant"), individually referred to as a "Party" and collectively referred to as the "Parties". The Parties wish to explore a business opportunity in the field of using Participant's geographic location technology with Google's search technology (the "Purpose"). In connection with this opportunity, each party may disclose to the other party certain confidential technical and business information. The parties have entered into this Agreement to assure the confidentiality of such information is maintained, in accordance with the following terms of this Agreement:

1. The Effective Date of this Agreement is November 28,2000.

2. The Confidential Information disclosed under this Agreement ("Confidential Information") includes all information concerning either party's business including, but not limited to, all tangible, intangible, visual, electronic, present, or future information such as: (a) trade secrets; (b) financial information, including pricing; (c) technical information, including research, development, procedures, algorithms, data, designs, and know-how; (d) business information, including operations, planning, marketing interests, and products; and (e) the terms of any agreement and the discussions, negotiations and proposals related to any agreement.

3. The Parties receiving Confidential Information (each, a "Recipient") will have a duty to protect Confidential Information (a) if it is clearly and conspicuously marked as "confidential" or the equivalent; or (b) if it is identified by the Discloser as confidential before, during, or promptly after presentation or communication.

4. A Recipient will use the Confidential Information only for the Purpose described above. A Recipient will use the same degree of care, but no less than a reasonable degree of care, as the Recipient uses with respect to its own similar information to protect the Confidential Information and to prevent (a) any use of Confidential Information not authorized in this Agreement, (b) dissemination of Confidential Information to any employee or third party contractor of Recipient without a need to know, or (c) communication of Confidential Information to any third party. Furthermore, Confidential Information may only be disseminated to an employee or third party contractor of the Recipient if that employee or third party contractor has signed an agreement with either of the Parties containing confidentiality provisions substantially similar to those herein.

5. Both parties agree not to do the following, except with the advanced review and written approval of the other party: (a) issue or release any articles, advertising, publicity or other matter relating to any Confidential Information (including the fact that a meeting or discussion has taken place between the parties) or mentioning or implying the name of the other party, or (b) make copies of documents containing Confidential Information.

6. This Agreement imposes no obligation upon a Recipient with respect to Confidential Information that (a) was known to the Recipient before receipt from the Discloser; (b) is or becomes publicly available through no fault of the Recipient; (c) is rightfully received by the Recipient from a third party without a duty of confidentiality; (d) is independently developed by the Recipient without a breach of this Agreement or (e) is disclosed by the Recipient with the Discloser's prior written approval; or (f) is required to be disclosed by operation of the law, provided that the

Recipient immediately notifies the Discloser of the legal obligation and provides the Discloser a reasonable opportunity to seek a protective order (or the equivalent) from the court or other legal or governmental authority issuing the process.

7. EACH DISCLOSER WARRANTS THAT IT HAS THE RIGHT TO DISCLOSE ITS CONFIDENTIAL INFORMATION. NO OTHER WARRANTIES ARE MADE. ALL CONFIDENTIAL INFORMATION CONTAINED HEREIN IS PROVIDED "AS IS".

8. This Agreement shall remain in effect until it is terminated by either Party with thirty (30) days prior written notice. Notwithstanding the foregoing, the terms and conditions of this Agreement shall survive with respect to Confidential Information that is disclosed before the effective date of termination.

9. Unless the Parties otherwise agree in writing, a Recipient's duty to protect Confidential Information expires five (5) years from the date of disclosure. A Recipient, upon Discloser's written request, will promptly return all Confidential Information received from the Discloser, together with all copies, or certify in writing that all such Confidential Information and copies thereof have been destroyed. Regardless of whether the Confidential Information is returned or destroyed, the Recipient may retain an archival copy of the Discloser's Confidential Information in the possession of outside counsel of its own choosing for use only in the event that a dispute arises hereunder and only in connection with that dispute.

10. No Party acquires any intellectual property rights under this Agreement (including but not limited to patent, copyright, and trademark rights) except the limited rights necessary to carry out the purposes as set forth in this Agreement.

11. Notwithstanding anything herein to the contrary, either party may use Residuals for any purpose, including use in the development, manufacture, promotion, sale and maintenance of its products and services; provided that this right to Residuals does not represent a license under any patents, copyrights or mask work rights of the disclosing party. The term "Residuals" means information of a general nature, such as general knowledge, ideas, concepts, know-how, professional skills, work experience or techniques (not specifics such as exact implementations) that is retained in the unaided memories of the receiving party's employees who have had access to the disclosing party's information pursuant to the terms of this Agreement. An employee's memory is unaided if the employee has not intentionally memorized the information for the purpose of retaining and subsequently using or disclosing it.

12. This Agreement does not create any agency or partnership relationship. This Agreement will not be assignable or transferable without the prior written consent of the other Party.

13. This constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes and prior oral or written agreements. All additions or modifications to this Agreement must be made in writing and must be signed by all Parties. Any failure to enforce a provision of this Agreement shall not constitute a waiver thereof or of any other provision.

14. This Agreement shall be governed by the laws of the State of California, without reference to conflict of laws principles. The exclusive venue for any dispute relating to this Agreement shall be in the state or federal courts within Santa Clara County, California.

**Google, Inc.**

By: _Steven Schimmel_

Name: Steven Schimmel

Title: Business Development Mgr

Address: 2400 Bayshore Parkway

City, State, Zip: Mountain View, California 94043

Date: 11/29/00

By: _Rob Friedman_

Name: Rob Friedman

Title: Co-President

Address: 4700 Rice Green Pkwy

City, State, Zip: Duluth GA 30096

Date: 11/29/00



# EXHIBIT / ATTACHMENT

## B

**(To be scanned in place of tab)**

NOV-30-2000 THU 04:52 PM    FAX NO.    P. 02



*Copy.*

*Note: Amendment*
*Sec. 2 modifies*
*Payment to*
*$4500 /mth*
*SS*

THIS PRODUCT AND ELECTRONIC DATABASE EVALUATION AND LICENSE AGREEMENT (this "Agreement") is made and entered into as of the 27th day of November, 2000, by and between **Google, Inc.** ("Licensee") and **Digital Envoy Inc.** ("Licensor"):

## WITNESSETH:

WHEREAS, Licensee is in the business of producing and maintaining information search technology (the "Business"); and

WHEREAS, Licensee desires to secure from Licensor the right to use Licensor's Personum product (the "Product") and certain geographic/IP address databases (the "Database Libraries") for purposes of utilizing the Product and the Database Libraries in the Business (the "Service");

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

## Section 1
### DATABASE LIBRARIES

Licensor agrees to establish and maintain the Database Libraries in a form suitable for Licensee's use pursuant to this Agreement. It is agreed that the form suitable for Licensee's use shall be electronic with data stored in a server database licensed in conjunction with the Product.

## Section 2
### LICENSOR SUPPORT AND LICENSEE RESPONSIBILITIES

Licensor agrees to provide electronic updates of the Database Libraries to Licensee, no less frequent than monthly. The updates shall have the most recent geographic/IP address data compiled by Licensor. It is understood that Licensor shall have no responsibility to maintain or support Licensee's content serving network. The Database Libraries shall be treated as confidential and proprietary information of Licensor, and except as otherwise noted herein the receiving party shall not disclose such information, directly or indirectly, to any third party, without the consent of the disclosing party. Licensor shall provide Licensee with on-going 24/7 technical support.

Licensee shall be responsible for supplying a server that meets the following specifications:
- a. Pentium III Xeon 550 MHz Linux server; dual processors preferred with a minimum of 512 Mb of RAM;
- b. High speed Ethernet card or other network interface card that interfaces with Licensee's network;
- c. Minimum of 10 gigabyte hard drive on a SCSI bus, RAIDing optional;
- d. Providing an Internet routable IP address for the server.

Licensor shall be responsible for providing Licensee with information to configure its server to interface with Licensor's central servers and shall provide Licensee with a C, Java or Perl API that encompasses functions that allow Licensee to interface to Licensor's database. The parties agree to establish commercially reasonable security measures with respect to such interface. Licensor shall not be responsible for supporting Licensee's server(s) or other hardware.

## Section 3
## GRANT OF RIGHTS

Licensor hereby grants Licensee the limited, worldwide right to use in its Business (and not distribute to any third party in whole or in part) the Product and the Database Libraries. Such right shall be nonexclusive. Such rights shall be strictly limited to the right to:

Doc# 273228 VE01

2



1. Input, download, and store some or all of the Database Libraries in files and memory; and compile some or all of the Database Libraries at the Site. Licensee may also use the Database Libraries to develop indices, services, or applications that are provided to third parties (e.g., developing a country-specific index of web pages). In no event, however, are the Database Libraries to be sold, licensed, distributed, shared or otherwise given (in any form) to any other party or used outside of the site set forth herein.

2. **Access and use the Database Libraries in the Business only at the Site.** The "Site" shall be defined as Google's offices and data centers.

## Section 4
## RESERVED RIGHTS

Licensor reserves the right to use the Database Libraries for its own business purposes and reserves the right to distribute the Database Libraries to others in the course of its business as it sees fit. Nothing in this license shall in any way restrict Licensor's or its customers' use of its Database Libraries.

## Section 5
## PAYMENT AND EVALUATION PERIOD

5.1 Licensee shall pay Licensor a monthly fee of three thousand dollars ($3,000) per month during the term of this Agreement for access to Licensor's geographic tailoring Product and the Database Libraries. Notwithstanding the foregoing, Licensor and Licensee acknowledge that it may take a brief period of time for Licensee to evaluate whether the Product and the Database Libraries will be useful in Licensee's business. Hence, subject to the terms and conditions of this License, Licensee shall be permitted to use the Database Libraries and the Product for a period of fourteen (14) days, without

charge and may terminate this agreement during such fourteen (14) day period in the event that Licensee, in its reasonable discretion, determines that the Database Libraries and Product are not useful for Licensee's business needs.

5.2 Licensee shall pay to Licensor all amounts accruing with respect to charges billed in each calendar month within 30 days after the said payment is due. There shall be applied to any amounts not paid by Licensee when due a delinquency charge of Eighteen Percent (18%) per annum prorated for partial periods of the unpaid principal balance thereof, commencing to accrue the calendar day after such due date.

<div align="center">

**Section 6**

**NO OTHER PAYMENT, ETC.**

</div>

Except as expressly provided in this Agreement, neither party shall be entitled to any payment, cost reimbursement, or other compensation from the other party in respect of its performance, and each party shall bear all its own expenses incurred in rendering performance.

<div align="center">

**Section 7**

**PROPRIETARY PROTECTION**

</div>

7.1 As between the parties hereto, Licensor shall be the sole owner of the Database Libraries, including any patents, copyrights or trade secrets associated with the Database Libraries or the underlying applications.

7.1a As between the parties hereto, Licensee shall be the sole owner of any services or products developed using the Database Libraries (but excluding the Database Libraries), including any patents, copyrights or trade secrets associated with such services or products.

7.2 Licensee shall have no right to copy or reverse engineer the Database

Doc# 273228 V#01

Libraries and/or the Product. Except as set forth in this Agreement, in no event shall Licensee distribute, disclose or otherwise make available the Database Libraries, or any information contained therein to any other party whatsoever or at any other site other than the Site, without the express written consent of Licensor.    Licensee shall hold all of Licensor's product information, including the results of any evaluation or testing thereof by Licensee in strict confidence and shall in no event share such information with any third parties.

**7.3** Licensee shall cooperate with Licensor (at Licensor's expense) with regard to any copyright registration of the Database Libraries, including updated versions thereof, that Licensor may choose to obtain. Both parties agree to cooperate with each other with respect to any other action that may be necessary or appropriate for the protection of the Database Libraries under applicable intellectual property laws.

**7.4** In the event that either party discovers an instance of possible infringement of Licensor's rights in the Database Libraries, such party shall promptly notify the other. The parties shall consult with one another with respect to the action that may be appropriate to stop or remedy such infringement.

**7.5** If a third party claims that the exercise by Licensee of the rights granted herein, including the provision and use of the Product based on the Database Libraries in accordance with this Agreement, infringes any patent, copyright, trade secret, or other proprietary right of any third party, Licensor will defend Licensee against that claim at Licensor's expense and Licensor will indemnify and hold harmless Licensee from and against any associated loss, liability, damage, or expense (including costs of investigation, court costs, and reasonable attorney's fees). Licensee agrees to cooperate with Licensor to determine the most cost-effective and practical means for responding to and disposing of any such matter.

## Section 8
## WARRANTIES; LIMITATIONS; DISCLAIMER

Licensor warrants that the Product will materially conform with its written specifications during the term of this Agreement. It is mutually acknowledged that data entry, communication and storage are subject to a possibility of human and machine errors, omissions, delays, and losses, including inadvertent loss of data or damage to media, which may give rise to loss or damage. Neither party hereto undertakes any liability to the other for any such errors, omissions, delays, or losses. EXCEPT AS STATED ABOVE, LICENSOR MAKES AND LICENSEE RECEIVES NO WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF THIS AGREEMENT OR ANY OTHER COMMUNICATION, REGARDING THE PRODUCT, THE DATABASE LIBRARIES AND THE SERVICES, AND LICENSOR SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY UNDERTAKES OR ACCEPTS ANY LIABILITY WHATSOEVER TO THE OTHER FOR ERRORS, OMISSIONS, DELAYS, INTERRUPTIONS, OR LOSSES UNLESS CAUSED BY THEIR WILLFUL MISCONDUCT.    EXCEPT FOR INDEMNIFICATION UNDER SECTION 7.5, IN NO EVENT SHALL EITHER PARTY'S DAMAGES IN ANY LAWSUIT OR OTHER ACTION BROUGHT UNDER THIS AGREEMENT EXCEED THE AMOUNTS PAID BY LICENSEE HEREUNDER.

### Section 9
### TERM

This Agreement shall commence to be effective on the date first shown above and shall remain in effect for an initial term of six (6) months from the initial payment hereunder. The Agreement shall be renewable for an additional six (6) month term at the discretion of Licensee. In addition, either party may terminate the Agreement in the event that the other party commits a material breach of this Agreement, provided that the aggrieved party shall first notify the other party of the breach and give such other party at least ten (10) days to cure the breach.

### Section 10
### FORCE MAJEURE

Doc# 273224 V#01

Neither party shall be liable or be deemed to be in default for any delay or failure in performance or interruption resulting directly or indirectly from any cause or circumstance beyond its reasonable control, equipment or telecommunications failure, labor dispute, or failure of any third party to perform any agreement that adversely affects such party's ability to perform its obligations hereunder.

### Section 11
### NOTICES

All notices or other communications required to be given hereunder shall be in writing and delivered either personally or by mail, courier, or similar reliable means of dispatch and addressed as provided in this Agreement or as otherwise requested by the receiving party. Notices delivered personally shall be effective upon delivery and notices delivered by any other means shall be effective upon their receipt by the party to whom they are addressed.

### Section 12
### GOVERNING LAW

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California as it applies to a contract made and performed in such state, excluding conflicts of laws principles. Any lawsuit regarding this Agreement shall be filed in the state or federal courts in Santa Clara County, California.

### Section 13
### MODIFICATION AND WAIVERS

This Agreement represents the entire understanding of the parties concerning its subject matter and may not be modified except by a writing signed by authorized representatives of both parties. A waiver by either party of its rights hereunder shall not be

Doc# 27255R V#01

binding unless contained in a writing signed by an authorized representative of the party waiving its rights. The nonenforcement or waiver of any provision of this Agreement on one occasion shall not constitute a waiver of such provision on any other occasion unless expressly so agreed in writing. It is agreed that no use of trade or other regular practice or method of dealing between the parties hereto shall be used to modify, interpret, supplement, or alter in any manner the terms of this Agreement.

<div align="center">

**Section 14**

**ASSIGNMENT**

</div>

Neither party shall be entitled to assign its rights and obligations under this Agreement to any successor to the ownership, management, or operation of the facilities and services of such party relating to the subject of this Agreement, without the written approval of the other party.

<div align="center">

**Section 15**

**NO IMPLIED RIGHTS OR OBLIGATIONS**

</div>

Nothing in this Agreement is intended to create any implied right to require, or any implied duty to provide, a level of effort or results (in general or in particular) not expressly stated herein, or to refrain from engaging in any other activity, including any activity involving the same or similar products or services with the same or similar customers or providers.    During the term of this Agreement, Licensor may include Licensee's name in a listing of Licensor's customers.  Before making any such listing available to the public, however, Licensor will submit the listing to Licensee to obtain written approval of its content and intended use, which approval shall not be unreasonably withheld or delayed.  Except for the foregoing, Licensor must first obtain Licensee's written consent before making any public use of Licensee's trade name, trademarks, service marks, logos, or other distinctive brand features, such public use including but not being limited to press releases and other marketing efforts.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

**DIGITAL ENVOY INC.**                      **GOOGLE**

By: _____                       By: _____
Authorized Signature                         Authorized Signature

Name: _Rob Friedman_                         Name: _URS HÖLZLE_
Title: _Co-President_                        Title: _VP Engineering_



# EXHIBIT / ATTACHMENT

## $C$

**(To be scanned in place of tab)**

# digital™
## envoy

THIS FIRST AMENDMENT TO THE PRODUCT AND ELECTRONIC DATABASE EVALUATION AND LICENSE AGREEMENT (this "Agreement") is made and entered into as of the _21_ day of December, 2000, by and between Google, Inc. ("Licensee") and Digital Envoy Inc. ("Licensor"):

1. The second paragraph under "WITNESSETH:" shall be amended to read as follows:

"WHEREAS, Licensee desires to secure from Licensor the right to use Licensor's *Personum* product (the "Product") and certain geographic/IP address databases that provide information at a metropolitan area level (the "Database Libraries") for purposes of utilizing the Product and the Database Libraries in the Business (the "Service");"

2. The first sentence of Section 5.1 of the Agreement shall be amended to read as follows:

"Licensee shall pay Licensor a monthly fee of Four thousand Five Hundred dollars ($4,500) per month during the term of this Agreement for access to Licensor's geographic tailoring Product and Database Libraries"

3. The remainder of the Agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

**DIGITAL ENVOY, INC.**

By: _____
Authorized Signature

Name: _Rob Friedman_
Title: _Co-President_

**GOOGLE, INC.**

By: _____
Authorized Signature

Name: _Steve Schimmel_
Title: _Business Development_



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**



### THIS SECOND AMENDMENT TO THE PRODUCT AND ELECTRONIC DATABASE EVALUATION AND LICENSE AGREEMENT (this "Agreement") is made and entered into as of the 17th day of July, 2001, by and between Google, Inc. ("Licensee") and Digital Envoy Inc. ("Licensor"):

1. Section 9 of the Agreement shall be amended to read as follows:

This Agreement shall commence to be effective on the date first shown above and shall remain in effect for an initial term of eighteen (18) months from the initial payment hereunder. The Agreement shall be renewable for an additional six (6) month term at the discretion of Licensee. In addition, either party may terminate the Agreement in the event that the other party commits a material breach of this Agreement, provided that the aggrieved party shall first notify the other party of the breach and give such other party at least ten (10) days to cure the breach.

2. The remainder of the Agreement shall continue in full force and effect as amended by the First Amendment to the Agreement previously executed by the parties and this Second Amendment.



IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

| DIGITAL ENVOY, INC. | GOOGLE, INC. |
|---|---|
| By: [signature] | By: [signature] |
| Authorized Signature | Authorized Signature |
| Name: Rob Friedman | Name: WAYNE ROSING |
| Title: EVP Corporate Development | Title: VP, ENGINEERING |

# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

**ːdigital™**
*e n v o y*

THIS RATIFICATION AGREEMENT (this "Agreement") is made and entered into as of the
*1st* day of January, 2003 (the "Effective Date"), by and between Google Technology Inc.
("Licensee") and Digital Envoy Inc. ("Licensor"):

**Background**

1.  Licensor and Licensee entered into a Product and Electronic Database Evaluation and
    License Agreement (the "Original Agreement") dated November 30, 2000, pursuant to which
    Licensee secured from Licensor the rights to use certain Products and Database Libraries
    (each as defined in that Original Agreement). Licensor and Licensee amended the Original
    Agreement with a First Amendment to the Product and Electronic Database Evaluation and
    License Agreement dated December 21, 2000 and a Second Amendment to the Product and
    Electronic Database Evaluation and License Agreement dated July 17, 2001 (collectively with
    the Original Agreement, the "Agreement").

2.  The Agreement expired as of November 30, 2002. The parties now desire to reinstate the
    Agreement and the Agreement shall now continue in force as if the same had not expired;
    provided, however, that the parties desire to amend the Agreement with respect to certain
    terms, as set forth below.

3.  The parties acknowledge that Licensee has continued to use the Product and the Database
    Libraries after the effective expiration of the Agreement and agree that Licensee paid to
    Licensor as full consideration for such continued usage a sum in the amount of US$4,500 in
    December 2002. The parties further acknowledge and agree that such usage by Licensee of
    the Product and the Database Libraries after the effective expiration of the Agreement shall
    be governed by and subject to the terms and conditions of the Agreement and Licensor
    hereby waives all claims that may now or hereafter be brought against Licensee in
    connection with such continued usage of the Product and the Database Libraries after the
    effective expiration of the Agreement.

**Terms**

1. The first sentence of Section 5.1 of the Agreement shall hereby be amended to read as follows:
"From January 2003 through the remainder of the term of this Agreement (including any extensions
thereof), Licensee shall pay Licensor a monthly fee of eight thousand dollars ($8,000) per month
during the term of this Agreement for access to Licensor's geographic targeting product (with
information provided down to the metro-area) and connection-type, ISP and domain data bases."

2. The first two sentences of Section 9 of the Agreement shall be replaced with the following:

"This Agreement shall commence to be effective on the date first shown above and shall remain in
effect for an initial term of twenty-four (24) months thereafter (i.e. from November 30, 2000 through
November 29, 2002) (the "Initial Term"). Thereafter, this Agreement shall automatically renew for an
additional term commencing on November 30, 2002 and ending on January 31, 2005 (the "First

1

GOOGLE CONFIDENTIAL

Renewal Term" and collectively with the Initial Term, the "Term"). Licensee, in its discretion, shall have the option to extend the Agreement for an additional two (2) year term thereafter (the "Extended Term") by providing written notice to Licensor no later than thirty (30) days prior to the expiration of the Term.  Additionally, prior to the expiration of the Extended Term, Licensee, in its discretion, shall have the option to extend the Agreement for an additional one (1) year term by providing written notice to Licensor no later than thirty (30) days prior to the expiration of the Extended Term."

3. The remainder of the Agreement shall continue in full force and effect.

This Agreement may be executed in counterparts, including facsimile counterparts.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

DIGITAL ENVOY, INC.                          GOOGLE TECHNOLOGY INC.

By: _____ [Seal]                     By: _____
Authorized Signature                         Authorized Signature

Name: _Rob Friedman_                         Name: _David Drummond_
Title: _E. VP Corp. Dev._                    Title: _VP Corporate_
                                                    _Development_



# EXHIBIT / ATTACHMENT

# F

**(To be scanned in place of tab)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DIGITAL ENVOY, INC., | CIVIL ACTION NO. 1:04-CV-0864 (CAP) |
| Plaintiff, | |
| v. | |
| GOOGLE, INC., | |
| Defendant. | |

## DECLARATION OF STEVEN SCHIMMEL

I, Steven Schimmel, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, depose and state as follows:

1.     My name is Steven Schimmel. I give this declaration of my personal knowledge in support of Defendant Google, Inc.'s ("Google") Motion to Dismiss or Transfer and Google's Response to Plaintiff's Emergency Motion for Expedited Discovery in Aid of Potential Motion for Preliminary Injunction in the above-captioned case, and for all other purposes authorized by law. I am more than 21 years of age and I suffer from no legal disability.

2.     I am Business Development Manager at Google and have been employed there since May 18, 1999. I work in the business development unit at Google and my responsibilities include negotiating contracts on behalf of the company.

1

3.    On November 30, 2000, Google and Plaintiff Digital Envoy, Inc. ("Digital Envoy") entered into a Product and Electronic Database Evaluation and License Agreement ("Agreement").  The Agreement was subsequently amended twice, on December 21, 2000 and July 17, 2001.  After the Agreement, as amended, expired, it was reinstated with a Ratification Agreement dated January 1, 2003.  Google and Digital Envoy have also entered into a Mutual Non-Disclosure Agreement, dated November 29, 2000.

4.    I was a key negotiator of the agreements and amendments identified in paragraph 3 of this Declaration on behalf of Google.

5.    The copies of the Agreement, First and Second Amendments, Ratification Agreement and Mutual Non-Disclosure Agreement attached to Google's Memorandum of Law in Support of its Motion to Dismiss or Transfer and to Google's Response to Plaintiff's Emergency Motion for Expedited Discovery in Aid of Potential Motion for Preliminary Injunction are true and accurate, to the best of my knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this /5th day of April, 2004, in Mountain View, California.

Steven Schimmel

2



# EXHIBIT / ATTACHMENT

G

**(To be scanned in place of tab)**

COPY
U.D.C., Atlanta

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAR 29 2004

LUTHER D. THOMAS, Clerk
By:
Deputy Clerk

| | |
|---|---|
| DIGITAL ENVOY, INC. | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| GOOGLE, INC. | ) |
| | ) |
|     Defendant | ) |

CIVIL ACTION: **1:04-CV-0864**

JURY TRIAL REQUESTED

## COMPLAINT

Plaintiff Digital Envoy, Inc. ("Digital Envoy"), for its Complaint against Defendant Google, Inc. ("Google"), respectfully shows the Court the following:

### *Summary of Complaint*

1.    Digital Envoy brings this action because Google is using Digital Envoy's technology in non-permitted ways. Digital Envoy seeks to recover for Google's wrongful use of Digital Envoy's technology which helped grow Google's business at a phenomenal rate without Google properly compensating Digital Envoy. Digital Envoy is the inventor and market leader in IP Intelligence technology which enables the determination of the geographic location of any computer hooked to the Internet by reliably and rapidly tracking protocol addresses.

2.      In November 2000, Digital Envoy and Google entered into an
agreement permitting Google to use Digital Envoy's technology for limited
uses.  At the beginning of this business relationship, Google properly used
the technology on its search site for a variety of purposes, including selling
what is referred to by Google as "paid links" (or links directly related to a
user search on Google.com which are paid for by third parties who want to
highlight their products to users and are highlighted as such on Google.com).

3.      Later, Google expanded its business model and began to service non-
search related advertising on third party sites and sell geographically
targeted advertising on those sites — using Digital Envoy's technology
outside the scope of the license and without compensating Digital Envoy.
From this wrongful conduct, Google has built a vast and profitable online
advertising business (which is a $7.2 billion/year industry and growing), and
Digital Envoy has lost substantial income opportunities.  Digital Envoy
brings this action to recover its lost income, to disgorge Google from its
wrongful income, to prevent Google from further wrongful conduct, and to
recover additional damages as provided by law.

### Parties, Jurisdiction and Venue

4.      Digital Envoy is a Georgia corporation with its principal place of
business in Norcross, Georgia.  The company was formed in October 1999

by the inventors of the technology which is the subject of this action and others.

5.    Google, Inc. is a California corporation with its principal place of business at its "Googleplex" in Mountain View, California.  In August 2003, Google registered as a foreign profit corporation with the Secretary of State of Georgia.  Its registered agent for service of process in Georgia is Corporation Service Company, 40 Technology Pkwy South, #300, Norcross, Georgia 30092.

6.    Google is subject to the jurisdiction of this Court pursuant to Georgia's Long-Arm Statute, O.C.G.A. § 9-10-91 in that Google transacts business within Georgia, has committed a tortious act or omission within Georgia, has committed a tortious injury in Georgia which was caused by actions or omission outside of Georgia and Google regularly does or solicits business and derives substantial revenue from services rendered in Georgia, and owns, uses or possesses real property situated in Georgia.

7.    This Court has jurisdiction over this dispute under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different States. Digital Envoy is a citizen of the State of Georgia and Google is a citizen of the State of California.  This Court also has jurisdiction over this dispute

under 28 U.S.C. § 1331 in that this action arises, in part, under the laws of the United States and the remainder of the claims are subject to the supplemental jurisdiction of this Court under 28 U.S.C. § 1367.

8.      Venue is proper in this District and Division under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of the property that is the subject of the action is situated in this district and division.

### *Factual Allegations*

### *Digital Envoy and its Technology*

9.      Digital Envoy invented and developed technology ("IP Intelligence") which essentially delivers specific information about a visitor to a website, including: geographic location down to the closest city, connection speed and, in some cases, the industry in which the visitor works.

10.     IP Intelligence represents a substantial breakthrough in Internet technology. The Internet contains more than 4 billion IP addresses, which incorporate no geographical information. Furthermore, IP addresses are assigned in random order, providing no logical associations based on the numbers. Digital Envoy's proprietary technology essentially maps the Internet's ever changing topology and overlays a geographical map which allows the technology to tie an IP address to a geographic location. Digital

Envoy has applied for a patent covering certain aspects of its technology and has received favorable indication from the Patent and Trademark Office.

11.    Digital Envoy delivers the information obtained through IP Intelligence with industry-leading reliability and virtually instantaneous speed which is essential for the practical uses of this information.

12.    Digital Envoy's customers benefit from this information in a variety of ways, such as permitting the assemblage of basic market data, enabling the website to publish its content in the visitor's language, enhancing security and enabling geographically targeted advertising.

13.    IP Intelligence also provides a superior manner of collecting this basic information, which otherwise would be obtained through the use of privacy-invading "cookies" or intrusive user questionnaires, either of which are more susceptible to abuse.

14.    Digital Envoy's simple business model is predicated upon receiving payment for its customers' fair use of this limited information.  Accordingly, its customers are restricted in their use of this information, such that it is not readily made available to third parties, except when expressly permitted in an agreement which fairly compensates Digital Envoy.  These restrictions are necessary to not foreclose Digital Envoy's business opportunities (either directly or indirectly) to do business with third party web sites directly.

- 5 -

15.    Digital Envoy's proprietary technology has significant and independent economic value to Digital Envoy because it is unique, and not generally known to, or readily ascertainable by proper means, by other persons who could obtain economic value from the use or disclosure of this technology. Furthermore, since the value of Digital Envoy's IP Intelligence technology is the delivery of information, the company takes reasonable measures to protect the unauthorized distribution of this information. Specifically, without limitation, Digital Envoy restricts its customers for specific licensed uses and transmits the information (known as Digital Envoy's "Database Library") in encrypted binary format.

16.    One of the most profitable uses of Digital Envoy's IP Intelligence technology is to enable its users to geographically target advertising on their website. By instantaneously obtaining the geographical location of a visitor down to the closest city, the customer can target specific advertising relevant to the visitor.

17.    The ability to target advertising in this matter is attractive to advertisers reluctant to buy Internet advertising which would otherwise be sent all over the world. Digital Envoy's customers can thus sell more advertising, and the advertising is more successful and thereby more profitable to the customer since Internet advertising is often paid on a click-

- 6 -

through basis, meaning the advertiser pays when a computer user actually clicks on the advertisement. Since geographically targeted advertising is more relevant to the customer's visitors, the "click-through rate" (or whatever other measure of success of the ad is employed) is often higher than un-targeted advertising.

18.    By filling this niche, Digital Envoy has developed into a small but profitable and growing business.

### *Google Background*

19.    Google is an Internet search engine company formed in September 1998. Through excellent technological innovations and strong financial backing, Google became the world's largest search engine in mid-2000.

20.    Google is a play on the word "googol" which refers to the number represented by the number 1 followed by 100 zeros. Google's use of the term reflects the company's mission to organize the immense, seemingly infinite amount of information available on the web.

21.    Google portrays itself as having started with a couple of students with an innovative idea who opened its door in an office attached to a garage of a friend. The Googleplex, as Google's present world headquarters is known, is (or was) complete with lava lamps, roving large dogs, a chef who is a Dead-head (a fan of the musical group, the Grateful Dead), and room in the

parking lot for twice-weekly roller hockey games. Google claims it is
working on offering searches in the fictional Klingon language from the
television show StarTrek.

22.    At the same time, Google is backed by funding from two leading
venture capital firms and has a management team, board of directors and
technical advisory council that rivals any company in the world for business
and financial acumen. Its two founders have also just joined *Forbes'*
billionaire club. Google also exceeded $1 billion in revenue in 2003, mostly
from advertising, and the company is valued at more than $15 billion.

23.    As with many Internet-based companies, Google did not make a profit
in its first three years. Google's principal source of income originally came
from marketing its search technology to other Internet-based companies. At
the same time, Google offered limited "paid link" opportunities on its
website. However, as described below, Google soon began to expand its
business from pure search into advertising and the company soon thereafter
achieved elusive *profitability*.

**The Agreement between Google and Digital Envoy**

24.    Google's "paid link" program began in mid-2000 and was originally
centered on the ability to offer paid links or relevant information tied to a
user's search request. Thus on its site, through keyword targeting or "paid

- 8 -

links", only those users who are actively conducting a web search and requesting information related to a third party's product are shown that third party's message. The third party pays Google for its placement of its "paid link" on Google.com.

25.    Google recognized that one factor in the relevance of paid links is geography. Accordingly, shortly after it began its paid link program, Google was attracted to Digital Envoy's technology which would permit paid link results which was geographically targeted to its audience.

26.    In November 2000, Google and Digital Envoy began to negotiate a license agreement whereby Google would have use of Digital Envoy's IP Technology to obtain the geographic location of visitors to its website, presumably to publish Google's site text in the visitor's language without prompt and to sell geographically targeted "paid links" on its website.

27.    On November 30, 2000, Google and Digital Envoy entered into a Product and Electronic Database Evaluation and License Agreement (the "Agreement").

28.    Under the Agreement, Google obtained a strictly limited, non-exclusive right to use Digital Envoy's IP Intelligence technology and Database Libraries only in Google's business of producing and maintaining *information search* technology and for no other business purpose (emphasis

- 9 -

added). Additionally, Google is expressly prohibited from selling, licensing, distributing, sharing or otherwise giving, *in any form*, the Database Libraries to any other party or using it outside of Google's site.

29.    Under the Agreement, Digital Envoy retained all ownership of the Database Libraries, including any patents, copyrights or trade secrets associated with the Database Libraries of its IP Intelligence technology. Google is also obligated under this Section to hold all of Digital Envoy's product information in strict confidence and is prohibited from sharing such information with any third parties, and from distributing, disclosing or *otherwise making available* the Database Libraries, or any information contained therein to any other party whatsoever.

30.    Google is also obligated under the Agreement to promptly notify Digital Envoy of any possible infringement of Digital Envoy's rights in the Database Libraries.

31.    For the use of Digital Envoy's IP Intelligence technology, including the Database Libraries, Google pays to Digital Envoy a flat monthly fee, originally $3,000 during the evaluation period and currently $8,000 per month.

### Google's use of Digital Envoy's technology

32.    Google used Digital Envoy's IP Intelligence technology to enable geographically targeted paid links, solely in conjunction with a user search, on its information search technology website. Such targeting fit well with Google's business program and was incorporated into Google's promotional materials directed to potential third party paid link purchasers on its website.

33.    Google's paid link program as well as its third party ad network program, as it is directed to outside companies on Google's search site, is called "AdWords" by Google. Google also has a Premium Sponsorship program for large participants to negotiate a specific agreement with Google. Companies signing up to use paid links through the AdWords program pay Google based on cost-per-click such that Google benefits financially when advertisements placed by Google are "clicked" on by the visitor to the site.

34.    To enhance the "click through rate", companies signing to obtain paid links and to participate in the Google Ad Network through the AdWords program are offered the option to geographically target their link. In fact, the first of the four steps required to sign up for the Google AdWords program requests the advertiser to choose its geographic targets, which, unless "All Countries" and "All Languages" are chosen, requires use of Digital Envoy's technology.

35.    The Premium Sponsorship paid link and ad network program is also based on the success of the paid link or advertisement, measured by the click through rate or some other measure, and also permits geographic targeting.

36.    At the time of the Agreement, Google had just begun to sign agreements with other Internet companies to power search services on those companies' sites. However, Google did not supply underlined advertising services to third party web sites at that time, had not contemplated providing such services and did not disclose to Digital Envoy its intention to enter into this business. Instead Google's business at the time was solely related to information search.

37.    On the strength of Google's targeted paid link program, which included Regional Targeting using Digital Envoy's IP Intelligence, Google had signed up more than 350 Premium Sponsorships and thousands of AdWords participants by mid-2001. Due to Google's targeted paid link program on Google.com, its click through rates at that time were four to five times higher than click through rates for traditional advertisement programs.

*Google's misuse of Digital Envoy's technology*

38.    By August 2002, Google began to enter into agreements to provide Google advertisements (including advertisements developed under its

AdWords program) on third party websites to which it was providing search services.

39.    In February – March, 2003, Google began to syndicate advertisements to major advertising networks supporting nearly 24,000 websites.  Google announced that it entered into this arrangement as part of a test of a new service to place text ads on pages selected for their relevance to a marketer's products or services.  Thus, for the first time, Google announced plans to place cost-per-click listings on content-targeted websites, rather than search-related pages.  Google advertisers, including the more than 100,000 active advertisers in its Google AdWords program, would thereafter have the option to appear on websites unrelated to search.   Google's business thus was expanding outside of information search.

40.    In May – June 2003, Google launched a new program which it called "Google AdSense" wherein Google would supply advertisements to any content-based website which signed up.   Google announced that the program was designed to maximize the revenue potential of a website by serving highly relevant ads specific to the content of the page.  Under this program, Google and the AdSense client share in revenue paid by the advertisers, typically on a per click basis or some other measure of the success of the advertisement on the AdSense client's website.  Google's

initial clients in the AdSense program included ABC.com, HowStuffWorks, Internet Broadcasting Systems, Inc., Lycos Europe, New York Post Online Edition, Reed Business Information and U.S. News & World Report. Google refers to third party web sites in its AdSense program and the delivery of advertisements on such sites, as the "Google Ad Network."

41.    As part of the service it provides to its clients, Google uses Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted, non-information search related, advertisements on those third party websites in the "Google Ad Network". Such use is beyond the scope of the Agreement between Google and Digital Envoy. Google did not obtain authorization from Digital Envoy to make such use and did not, in fact, tell Digital Envoy that it was doing so.

42.    Due in large part to the strength of its AdSense program, Google more than doubled its revenues from 2002 to 2003, and the trend continues upward in 2004. Google specifically makes substantial income and profit from the placement of geographically targeted, non-information search related, advertisements on its client's websites in the Google ad network.

43.    At the same time, Digital Envoy has received no income from Google's unauthorized use of Digital Envoy's proprietary technology, but instead has lost significant licensing opportunities.

- 14 -

44.    In February 2004, Digital Envoy notified Google that it considered Google's use of Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted advertising on third party websites to be unauthorized under the Agreement. Google admitted to its conduct but refused to stop. Instead, in response to Digital Envoy's inquiry, Google offered to increase its payment under the Agreement to $12,000 per month. Digital Envoy rejected this offer because it fell woefully short of the income enjoyed by Google and the lost income to Digital Envoy as a result of Google's unauthorized conduct.

## Count I
## (Misappropriation of Trade Secrets)

45.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 44 as if fully stated herein.

46.    Digital Envoy's IP Intelligence and its Database Libraries are trade secrets, protected by law.

47.    Although acquired by lawful means, Google's misuse of Digital Envoy's trade secrets constitutes a misappropriation in that it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use and that Google used Digital Envoy's trade secrets through improper means.

- 15 -

48.    Google's misappropriation of Digital Envoy's trade secrets have damaged Digital Envoy through lost income, licensing and other business opportunities.

49.    Google's misappropriation of Digital Envoy's trade secrets have also unjustly enriched Google.

50.    Digital Envoy is entitled to recover damages against Google in amounts to be proved at trial.

51.    Google's actions have been willful and malicious.  Accordingly, Digital Envoy is entitled to recover punitive damages against Google in amounts to be determined by the enlightened conscience of the jury.

## COUNT II
## (Federal Unfair Competition)

52.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 51 as if fully stated herein.

53.    Google's actions, as set forth above, made in connection with services and used in commerce, falsely designate the origin of its services, are misleading in their description or representation of fact.  Google's actions deceive others (including its AdSense and AdWords customers) as to the origin and approval of its services and its commercial activities and Digital Envoy is damaged by this conduct.  Google's actions thus constitute violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

54.    Google acted as set forth above with knowledge and in disregard of Digital Envoy's rights.

55.    Digital Envoy is entitled to recover its actual damages, Google's profits, treble damages and its attorneys' fees.

56.    In the manner set forth above, Google has also irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

### Count III
### (Unfair Competition under Georgia Law)

57.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 56 as if fully stated herein.

58.    As set forth above, Google has engaged, and is continuing to engage in acts of unfair competition in violation of O.C.G.A. § 10-1-372.

59.    Google acted as set forth above with knowledge and deceit and in disregard of Digital Envoy's rights and has caused Digital Envoy actual damages.

60.    In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

61.    Digital Envoy is thereby entitled to recover its attorneys' fees from Google.

## COUNT IV
## (Common Law Unfair Competition)

62.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 61 as if fully stated herein.

63.    The actions of Google set forth above constitute unfair competition in violation of common law in that:

(a)    the actions enable Google to obtain the benefit of, and trade on, the goodwill of Digital Envoy;

(b)    the actions by Google damage Digital Envoy in that Digital Envoy has no control over the business of Google;

(c)    the actions of Google are likely to cause, and have caused, confusion, mistake or deception; and

(d)    the actions of Google will result in the unjust enrichment of Google.

64.    Google acted as set forth above with knowledge, in bad faith and in willful disregard of Digital Envoy's rights.

65.    In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

66.    Digital Envoy is also entitled to an award of damages to be proved at trial, punitive damages and attorneys' fees.

## COUNT V
## (Common Law Unjust Enrichment)

67.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 66 as if fully stated herein.

68.    As set forth above, Google has used and continues to use Digital Envoy's technology and information for purposes outside the scope of the Agreement.

69.    Google and Digital Envoy had no agreement or understanding which would govern the relationship of the parties for the extra-contractual use set forth above.

70.    In this manner, Google has received distinct and direct benefits from Digital Envoy, but without compensating Digital Envoy.  Google has thereby been unjustly enriched.

71.    Accordingly, Digital Envoy is entitled to recover from Google all monies earned in connection with Google's extra-contractual use of Digital Envoy's proprietary technology and information, in amounts to be proved at trial.

WHEREFORE, Plaintiff Digital Envoy, Inc. prays for a trial by jury on all issues, judgment in its favor and against Defendant Google, Inc. for actual damages, disgorgement of profits, recovery of monies earned, treble

- 19 -

damages, punitive damages, attorneys' fees interest and costs, and for an

injunction prohibiting Defendant Google, Inc. from using Digital Envoy's

proprietary technology and information beyond the scope of the Agreement,

specifically including supplying geographically targeted advertisements on

third party websites.

Respectfully submitted this 29th day of March , 2004.

Timothy H. Kratz
Georgia Bar No. 429297
Luke Anderson
Georgia Bar No. 018330
John A. Lockett, III
Georgia Bar No. 455549

**McGuireWoods LLP**
1170 Peachtree Street, NE
Suite 2100, The Proscenium
Atlanta, Georgia 30309-1234
Telephone:  (404) 443-5730          Attorneys for Plaintiff
Facsimile:  (404) 443-5784          Digital Envoy, Inc.