FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAY 1 7 2004

LUTHER D. THOMAS, Clerk
By: *J. Finely* Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIGITAL ENVOY, INC.            )
                               )
        Plaintiff              )
                               )        CIVIL ACTION NO.
vs.                            )        1:04-CV-0864 (CAP)
                               )
GOOGLE, INC.                   )
                               )
        Defendant              )
_____)

## PLAINTIFF'S INITIAL DISCLOSURES

(1)  State precisely the classification of the cause of action being filed, a brief factual outline of the case including plaintiff's contentions as to what defendant did or failed to do, and a succinct statement of the legal issues in the case.

*Response:*

### Classification of Cause of Action

**Count I — Misappropriation of Trade Secrets.  Digital Envoy contends that its technology as defined in the complaint is a protected trade secret.  Although Google came rightfully into possession of this information, its license to use it was limited to the specific uses permitted in the agreement.  Google's use of Digital Envoy's trade**

secrets beyond its license constitutes an actionable misappropriation of Digital Envoy's trade secrets. Under state law, Digital Envoy is entitled to recover its actual damages, disgorgement of Google's earnings from the misappropriation and an injunction. Further, Google's actions were willful, malicious and in bad faith such that Google is entitled to punitive damages.

Count II — Federal Unfair Competition. Digital Envoy contends that Google has committed violations of 15 U.S.C. § 1125(a), and continues to commit such violations. Specifically, Google falsely designates the origin of certain of its services, and misleads in its description or representations of fact, deceiving others. As a result, Digital Envoy is entitled to recover its actual damages, Google's profits, treble damages, an injunction and attorneys' fees.

Count III — Georgia Unfair Competition. Digital Envoy contends that Google has committed acts in violation of Georgia unfair competition law for the same reasons described in Count II. As a result, Digital Envoy is entitled to an injunction and attorneys' fees.

Count IV — Common Law Unfair Competition, Digital Envoy contends that Google's conduct as to be proven in this action constitutes

an actionable claim of unfair competition under common law. As such, Digital Envoy is entitled to recover actual damages, punitive damages, an injunction and attorneys' fees.

Count V — Unjust Enrichment. Due to Google's actions outside the agreement between the parties, Google has wrongfully received benefit without compensating Digital Envoy. As such, Digital Envoy is entitled to recover a disgorgement of Google's revenue earned from the unauthorized use of Digital Envoy's technology.

### Factual Outline

Digital Envoy invented and developed technology ("IP Intelligence") which essentially delivers specific information about a visitor to a website, including: geographic location down to the closest city, connection speed and, in some cases, the industry in which the visitor works. IP Intelligence represents a substantial breakthrough in Internet technology. The Internet contains more than 4 billion IP addresses, which incorporate no geographical information. Furthermore, IP addresses are assigned in random order, providing no logical associations based on the numbers. Digital Envoy's proprietary technology essentially maps the Internet's ever changing topology and

overlays a geographical map which allows the technology to tie an IP address to a geographic location. Digital Envoy has applied for a patent covering certain aspects of its technology and has received favorable indication from the Patent and Trademark Office.

Digital Envoy delivers the information obtained through IP Intelligence with industry-leading reliability and virtually instantaneous speed which is essential for the practical uses of this information.

Digital Envoy's customers benefit from this information in a variety of ways, such as permitting the assemblage of basic market data, enabling the website to publish its content in the visitor's language, enhancing security and enabling geographically targeted advertising.

IP Intelligence also provides a superior manner of collecting this basic information, which otherwise would be obtained through the use of privacy-invading "cookies" or intrusive user questionnaires, either of which are more susceptible to abuse.

Digital Envoy's simple business model is predicated upon receiving payment for its customers' fair use of this limited information. Accordingly, its customers are restricted in their use of this information, such that it is not readily made available to third parties, except when

expressly permitted in an agreement which fairly compensates Digital Envoy. These restrictions are necessary to not foreclose Digital Envoy's business opportunities (either directly or indirectly) to do business with third party web sites directly.

Digital Envoy's proprietary technology has significant and independent economic value to Digital Envoy because it is unique, and not generally known to, or readily ascertainable by proper means, by other persons who could obtain economic value from the use or disclosure of this technology. Furthermore, since the value of Digital Envoy's IP Intelligence technology is the delivery of information, the company takes reasonable measures to protect the unauthorized distribution of this information. Specifically, without limitation, Digital Envoy restricts its customers for specific licensed uses and transmits the information (known as Digital Envoy's "Database Library") in encrypted binary format.

One of the most profitable uses of Digital Envoy's IP Intelligence technology is to enable its users to geographically target advertising on their website. By instantaneously obtaining the geographical location of

a visitor down to the closest city, the customer can target specific advertising relevant to the visitor.

The ability to target advertising in this matter is attractive to advertisers reluctant to buy Internet advertising which would otherwise be sent all over the world. Digital Envoy's customers can thus sell more advertising, and the advertising is more successful and thereby more profitable to the customer since Internet advertising is often paid on a click-through basis, meaning the advertiser pays when a computer user actually clicks on the advertisement. Since geographically targeted advertising is more relevant to the customer's visitors, the "click-through rate" (or whatever other measure of success of the ad is employed) is often higher than un-targeted advertising.

By filling this niche, Digital Envoy has developed into a small but profitable and growing business.

Google was initially an Internet search engine company formed in September 1998. Through excellent technological innovations and strong financial backing, Google became the world's largest search engine in mid-2000.

As with many Internet-based companies, Google did not make a profit in its first three years. Google's principal source of income originally came from marketing its search technology to other Internet-based companies. At the same time, Google offered limited "paid link" opportunities on its website. However, as described below, Google soon began to expand its business from pure search into advertising and the company soon thereafter achieved elusive *profitability*.

Google's "paid link" program began in mid-2000 and was originally centered on the ability to offer paid links or relevant information tied to a user's search request. Thus on its site, through keyword targeting or "paid links", only those users who are actively conducting a web search and requesting information related to a third party's product are shown that third party's message. The third party pays Google for its placement of its "paid link" on Google.com.

Google recognized that one factor in the relevance of paid links is geography. Accordingly, shortly after it began its paid link program, Google was attracted to Digital Envoy's technology which would permit paid link results which was geographically targeted to its audience.

In November 2000, Google and Digital Envoy began to negotiate a license agreement whereby Google would have use of Digital Envoy's IP Technology to obtain the geographic location of visitors to its website, presumably to publish Google's site text in the visitor's language without prompt and to sell geographically targeted "paid links" on its website.

On November 30, 2000, Google and Digital Envoy entered into a Product and Electronic Database Evaluation and License Agreement (the "Agreement").

Under the Agreement, Google obtained a strictly limited, non-exclusive right to use Digital Envoy's IP Intelligence technology and Database Libraries only in Google's business of producing and maintaining *information search* technology and for no other business purpose (emphasis added). Additionally, Google is expressly prohibited from selling, licensing, distributing, sharing or otherwise giving, *in any form*, the Database Libraries to any other party or using it outside of Google's site.

Under the Agreement, Digital Envoy retained all ownership of the Database Libraries, including any patents, copyrights or trade secrets

associated with the Database Libraries of its IP Intelligence technology. Google is also obligated under this Section to hold all of Digital Envoy's product information in strict confidence and is prohibited from sharing such information with any third parties, and from distributing, disclosing or *otherwise making available* the Database Libraries, or any information contained therein to any other party whatsoever.

Google is also obligated under the Agreement to promptly notify Digital Envoy of any possible infringement of Digital Envoy's rights in the Database Libraries.

For the use of Digital Envoy's IP Intelligence technology, including the Database Libraries, Google pays to Digital Envoy a flat monthly fee, originally $3,000 during the evaluation period and currently $8,000 per month.

Shortly after the beginning of the Agreement, Google properly used the technology on its search site for a variety of purposes, including selling what is referred to by Google as "paid links" (or links directly related to a user search on Google.com which are paid for by third parties who want to highlight their products to users and are highlighted as such on Google.com).

Google used Digital Envoy's IP Intelligence technology to enable geographically targeted paid links, solely in conjunction with a user search, on its information search technology website. Such targeting fit well with Google's business program and was incorporated into Google's promotional materials directed to potential third party paid link purchasers on its website.

Google's paid link program as well as its third party ad network program, as it is directed to outside companies on Google's search site, is called "AdWords" by Google. Google also had a Premium Sponsorship program for large participants to negotiate a specific agreement with Google. Companies signing up to use paid links through the AdWords program pay Google based on cost-per-click such that Google benefits financially when advertisements placed by Google are "clicked" on by the visitor to the site.

To enhance the "click through rate", companies signing to obtain paid links and to participate in the Google Ad Network through the AdWords program are offered the option to geographically target their link. In fact, the first of the four steps required to sign up for the Google AdWords program requests the advertiser to choose its

geographic targets, which, unless "All Countries" and "All Languages" are chosen, requires use of Digital Envoy's technology.

The Premium Sponsorship paid link and ad network program was also based on the success of the paid link or advertisement, measured by the click through rate or some other measure, and also permited geographic targeting. On January 1, 2004, Google merged its Premium Sponsorship program into the AdWords program which had the same pricing model.

At the time of the Agreement, Google had just begun to sign agreements with other Internet companies to power search services on those companies' sites. However, Google did not supply advertising services to third party web sites at that time, had not contemplated providing such services and did not disclose to Digital Envoy its intention to enter into this business. Instead Google's business at the time was solely related to information search.

On the strength of Google's targeted paid link program, which included Regional Targeting using Digital Envoy's IP Intelligence, Google had signed up more than 350 Premium Sponsorships and thousands of AdWords participants by mid-2001. Due to Google's

targeted paid link program on Google.com, its click through rates at that time were four to five times higher than click through rates for traditional advertisement programs.

Launched in early 2002, by August 2002, Google began to enter into agreements to provide Google advertisements (including advertisements developed under its AdWords program) on third party websites to which it was providing search services.

In February – March, 2003, Google began to syndicate advertisements to major advertising networks supporting nearly 24,000 websites. Google announced that it entered into this arrangement as part of a test of a new service to place text ads on pages selected for their relevance to a marketer's products or services. Thus, for the first time, Google announced plans to place cost-per-click listings on content-targeted websites, rather than search-related pages. Google advertisers, including the more than 100,000 active advertisers in its Google AdWords program, would thereafter have the option to appear on websites unrelated to search. Google's business thus was expanding outside of information search.

In May – June 2003, Google launched a new program which it called "Google AdSense" wherein Google would supply advertisements to any content-based website which signed up.  Google announced that the program was designed to maximize the revenue potential of a website by serving highly relevant ads specific to the content of the page.  Under this program, Google and the AdSense client share in revenue paid by the advertisers, typically on a per click basis or some other measure of the success of the advertisement on the AdSense client's website.  Google's initial clients in the AdSense program included ABC.com, HowStuffWorks, Internet Broadcasting Systems, Inc., Lycos Europe, New York Post Online Edition, Reed Business Information and U.S. News & World Report.  Google refers to third party web sites in its AdSense program and the delivery of advertisements on such sites, as the "Google Ad Network."

Google now refers to AdSense for search and AdSense for content to distinguish delivery of ads to its search partners and the network of content sites.

As part of the service it provides to its clients, Google uses Digital Envoy's IP Intelligence technology and Database Libraries to provide

geographically targeted, non-information search related, advertisements on those third party websites in the "Google Ad Network". Such use is beyond the scope of the Agreement between Google and Digital Envoy. Google did not obtain authorization from Digital Envoy to make such use and did not, in fact, tell Digital Envoy that it was doing so.

Due in large part to the strength of its AdSense program, Google more than doubled its revenues from 2002 to 2003, and the trend continues upward in 2004. Google makes substantial income and profit from the placement of geographically targeted, non-information search related, advertisements on its client's websites in the Google ad network.

Specifically, the net revenues generated from the fees advertisers pay Google when users click on ads that Google delivered to the web sites of "Google Network members'" (the current nomenclature for AdSense customers) represented approximately 15% of Google's net revenues in 2003, and approximately 21% of Google's net revenues in the first quarter of 2004. Google expects the percentage of net income received from this program to increase in the future.

In 2003, Google received $144,411,000 in net revenues from placing advertisements on Google Network web sites. In the first quarter 2004, Google already received $82,246,000 for the same thing. These revenues are net of money paid to the Google Network members as a share in the revenue generated by the advertisement. On information and belief, a large percentage of this revenue was from advertisements for which geographic targeting was enabled.

Google's profit on this revenue is substantial. In 2003, the cost of revenue was only 12.7% of the net revenue. In the first quarter of 2004, the cost of revenue was 13.7%.

From 2002 through first quarter 2004, Google's net revenue less the cost of revenue for advertising placed on Google Network web sites was $207,915,000.

At the same time, Digital Envoy has received no income from Google's unauthorized use of Digital Envoy's proprietary technology, but instead has lost significant licensing opportunities.

In February 2004, Digital Envoy notified Google that it considered Google's use of Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted advertising

on third party websites to be unauthorized under the Agreement. Google admitted to its conduct but refused to stop. Instead, in response to Digital Envoy's inquiry, Google offered to increase its payment under the Agreement to $12,000 per month. Digital Envoy rejected this offer because it fell woefully short of the income enjoyed by Google and the lost income to Digital Envoy as a result of Google's unauthorized conduct.

### Legal Issues

1.    Does Google's conduct constitute a misappropriation of trade secrets?

2.    Does Google's conduct constitute a violation of federal unfair business practices law?

3.    Does Google's conduct constitute a violation of state unfair business practices law?

4.    Does Google's conduct constitute a violation of common law unfair business practices law?

5.    Does Google's conduct constitute unjust enrichment under common law?

Cal. Civ. Code § 17200 et seq and cases cited thereto

**References to Legal Principles:**

Uniform Trade Secrets Act and cases cited thereto

Restatement of Torts, § 757 and cases cited thereto

Restatement (Third) of Unfair Competition and cases cited thereto

**Case Law:**

Note: Citations below may or may not be applicable to the particular issue involved and, in some cases, may support Plaintiff's argument by its distinguishing features

*Penalty Kick Management Ltd. v. Coca Cola Co.*, 318 F. 3d 1289 (11th Cir. 2003)

*Ruehn v. Selton & Assocs*, 242 Ga. App. 662, 530 S.E.2d 787 (2000)

*Salsbury Labs, Inc. v. Merieux Labs, Inc.*, 908 F.2d 706 (11th Cir. 1990)

*Essex Group, Inc. v. Southwire Co.*, 269 Ga. 553, 501 S.E.2d 501 (1998)

*Tronitec, Inc. v. Shealy*, 249 Ga.App. 442, 547 S.E.2d 749 (2001)

*Robert L. Cloud & Assoc. Inc. v. Mikewell*, 82 Cal.Rptr.2d 143 (Ct.App. 1999)

*Linko, Inc. v. Fujitsu Ltd.*, 232 F.Supp.2d 182 (S.D. N.Y. 2002)

*Twin Vision Corp. v. BellSouth Commun. Sys.*, 1998 U.S.App. LEXIS 13607 (9th Cir. 1998)

*General Elec. Co. v. Chien-Min Sung*, 843 F.Supp. 776 (1994)

*Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683 (11th Cir. 1998)

*Centorr Assoc. Inc. v. Tokyo Tokushu Neco Ltd.*, 1991 U.S.Dist LEXIS 13897 (N.D.Cal. 1991)

*Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.*, 223 F.Supp.2d 953 (N.D. Ill.)

*Klockner-Humbolt-Deutz Aktiengellschaft, Kola v. Hewitt-Robins Div. of Litton Systems, Inc.*, 1978 U.S.Dist.LEXIS 15825 (D.S.C. 1978)

*Integrated Cash Management, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171 (2nd Cir. 1990)

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989)

*Franke v. Wiltshek*, 209 F.2d 493 (2nd Cir. 1953)

*Servo Corp. of America v. General Elec. Co.*, 393 F.2d 551 (4th Cir. 1968)

*Clark v. Bunke*, 453 F.2d 1006 (9th Cir. 1972)

*Wilson v. Electro Marine Sys., Inc.*, 915 F.2d 1110 (7th Cir. 1990)

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041 (2003)

*Coastal Steel Corp. v. Tilghman Wheelbrator Ltd.*, 709 F.2d 190 (3rd Cir. 1983)

*Kerobo v. Sothwestern Clean Fuels, Corp.*, 285 F.3d 531 (6th Cir. 2002)

*Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179 (11th Cir. 2002)

*Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256 (2004)

*Smith v. McClung*, 215 Ga. App. 786, 452 S.E.2d 229 (1994)

*Georgia Tile Distrib., Inc. v. Zumpano Enterprises, Inc.*, 205 Ga.App. 487, 422 S.E.2d (1992)

*Venture Industries Corp. v. Autoliv, ASP. Inc.*, 2002 U.S.Dist.LEXIS 24633 (E.D.Mich. 2002)

*Ramin Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115 (N.D.Cal. 2001)

*In Re: Cardizem CD Antitrust Litigation* 105 F.Supp.2d 618 (E.D.Mich. 2000)
*Mstislav Rostropovich v. Koch Int'l Corp.*, 1995 U.S. Dist. LEXIS 2785 (S.D.N.Y. 1995)

*Unilogic, Inc. v. Burooughs Corp.*, 12 Cal.Rptr.2d 741, 10 Cal.App. 612 (1992)

*Cacique, Inc. v. Robert Reiser & Co., Inc.*, 169 F.3d 619 (9th Cir. 1999)

**Cases cited in briefs already filed with the Court**


(3) Provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that you may use to support your claims or defenses, unless solely for impeachment, identifying the subjects of the information.

*Response:*


**See Attachment A.**


(4)  Provide the name of any person who may be used at trial to present evidence under Rules 702, 703, or 706 of the Federal Rules of

Evidence.  For all experts described in Fed. R. Civ. P. 26(a)(2)(B), provide a separate written report satisfying the provisions of that rule.

**Response:**

**See Attachment B.**

(5)  Provide a copy of, or description by category and location of, all documents, data compilations, and tangible things in your possession, custody, or control that you may use to support your claims or defenses unless solely for impeachment, identifying the subjects of the information.

**Response:**

**See Attachment C.**

(6)  In the space provided below, provide a computation of any category of damages claimed by you.  In addition, include a copy of, or describe by category and location of, the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered, making such documents or evidentiary material available for inspection and copying as under Fed. R. Civ. P. 34.

**Response:**

**See Attachment D.**

(7)  Attach for inspection and copying as under Fed. R. Civ. P. 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be

entered in this action or to indemnify or reimburse for payments to satisfy the judgment.

*Response:*

**None.**


(8)  Disclose the full name, address and telephone number of all persons or legal entities who have a subrogation interest in the cause of action set forth in plaintiffs cause of action and state the basis and extent of such interest.

*Response:*

**None.**



# EXHIBIT / ATTACHMENT

A

(To be scanned in place of tab)

# ATTACHMENT A
## Witness List

1.    Rob Friedman
      Digital Envoy
      c/o Plaintiff's counsel only

Mr. Friedman has knowledge of all aspects of the relationship between
Digital Envoy and Google, as well as Digital Envoy's relationship with its
other customers, and Digital Envoy's technology and its business affairs.

2.    Sanjay Parekh
      Digital Envoy
      c/o Plaintiff's counsel only

Mr. Parekh has knowledge of Digital Envoy's technology and its business
affairs, including the relationship with Google and its other customers.

3.    Steven Schimmel
      Google

Mr. Schimmel has knowledge of the formation of the contract between
Digital Envoy and Google, and other aspects of Google's business and
technology.

4.    Sukhinder Singh
      Google

Mr. Singh has knowledge regarding Google's local search program, and
other aspects of Google's business and technology.

5.    Jeffrey Dean
      Google

Mr. Dean has knowledge of Google's technology.

6.    Georges Harik
      Google

Mr. Harik has knowledge of Google's technology.

7.    Paul Bucheit
      Google

Mr. Bucheit has knowledge of Google's technology.

8.    David Drummond
      Google

Mr. Drummond has knowledge of the contract between Google and Digital
Envoy, and other aspects of Google's business and technology.

9.    Salar Kamangar
      Google

Mr. Kamangar has knowledge of the AdWords program and pricing, and
other aspects of Google's business and technology.

10.   Susan Wojcicki
      Google

Ms. Wojcicki has knowledge of the AdWords program and pricing, the
AdSense program and other aspects of Google's business and technology.

11.   Joan Braddi
      Google

Ms. Braddi has knowledge of Google's third party search program, and other
aspects of Google's business and technology.

12.   Tim Armstrong
      Google

Mr. Armstrong has knowledge of Google's advertising program, and other aspects of Google's business and technology.

13.    Jonathan Rosenberg
       Google

Mr. Rosenberg has knowledge of the development of Google's programs, and other aspects of Google's business and technology.

14.    Cindy McCaffrey
       Google

Ms. McCaffrey has knowledge of Google's corporate communications, and other aspects of Google's business and technology.

15.    Omid Kordestani
       Google

Mr. Kordestani has knowledge of the AdSense program, and other aspects of Google's business and technology.

16.    Matt Cutts
       Google

Mr. Cutts has knowledge of Google's corporate communications, geo-location technology , and other aspects of Google's business and technology.

17.    Sergey Brin
       Google

Mr. Brin has knowledge of Google's decisions regarding geo-location technology, AdSense, AdWords, and other aspects of Google's business and technology, its corporate communications and business policies and plans.

18.    Larry Page
       Google

Mr. Page has knowledge of Google's decisions regarding geo-location technology, AdSense, AdWords, and other aspects of Google's business and technology, its corporate communications and business policies and plans.

19.    Eric Schmidt
       Google

Mr. Schmidt has knowledge of Google's decisions regarding geo-location technology, AdSense, AdWords, and other aspects of Google's business and technology, its corporate communications and business policies and plans.

20.    Jeffery Donovan
       Google

Mr. Donovan has knowledge of Google's corporate development and information pertaining to use of Digital Envoy's technology.

21.    Leslie Yeh
       Google

Ms. Yeh has knowledge of Google's use of Digital Envoy's technology.

22.    Zhe (additional portion of name unknown)
       Google

Zhe has knowledge of Google's use of Digital Envoy's technology.

23.    Sridhar Ramasamy
       Google

Mr. Ramasamy has knowledge of Google's use of Digital Envoy's technology.

24.    Jeremy Chau
       Google

Mr. Chau has knowledge of Google's use of Digital Envoy's technology.

25.    Amit Patel
       Google

Mr. Patel has knowledge of Google's use of Digital Envoy's technology.

26.    Dan Egnor
       Google

Mr. Egnor has knowledge of Google's use of Digital Envoy's technology.

27.    Scott Benson
       Google

Mr. Benson has knowledge of Google's use of Digital Envoy's technology.

28.    Steve Berkowitz
       Ask Jeeves

Mr. Berkowitz has knowledge of Google's business relationship with Ask
Jeeves.

29.    Jim Lanzone
       Ask Jeeves

Mr. Lanzone has knowledge of Google's business relationship with Ask
Jeeves.

30.    Paul Levine
       Yahoo

Mr. Levine has knowledge of Google's relationship with Yahoo and the
internet advertising business generally.

31.    Bill Shaugnessy
       General Manager
       MSN Communications &
       Merchant Services



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

# ATTACHMENT B
## Expert List

At this point in time, Digital Envoy has not identified any experts described in Fed. R. Civ. P. 26(a)(2)(B) who may be used at trial to present evidence under Rules 702, 703 or 706 of the Federal Rules of Evidence.

Pursuant to Fed. R. Civ. P. 26(a)(2)(A), Digital Envoy discloses that Rob Freedman and Sanjay Parekh may be used at trial to present evidence under Rules 702, 703 or 706 of the Federal Rules of Evidence but are not persons who are described in Rule 26(a)(2)(B).

As to both categories of persons, Digital Envoy anticipates that additional persons will be identified and disclosed. Digital Envoy will supplement this disclosure as provided by Rule.



# EXHIBIT / ATTACHMENT

$C$

(To be scanned in place of tab)

# ATTACHMENT C
## Document List

1.    The Agreement, as defined in the Complaint, with amendments.

2.    Documents reflecting communications between the parties leading up to execution of the Agreement.

3.    Other agreements between the parties, including communications pertaining thereto.

4.    Documents reflecting communications between the parties regarding performance under the Agreement.

5.    Documents reflecting performance under the Agreement.

6.    Collected information on Google's business activities from public sources.

7.    Digital Envoy web site information.

8.    Google web site information.

9.    Documents reflecting Digital Envoy's licensing of third parties for targeted advertising on their content web sites.

10.    Documents reflecting Digital Envoy's licensing of advertising networks for targeted advertising on a partial revenue share basis.

All categories of documents in Digital Envoy's possession, custody or control are located either at Digital Envoy's office in Norcross, Georgia or at Digital Envoy's counsel's office in Atlanta, Georgia.



# EXHIBIT / ATTACHMENT

D

(To be scanned in place of tab)

## ATTACHMENT D
## <u>Damages</u>

### *1.      Actual damages — recoverable under Counts I, II and IV.*

Google's wrongful actions have caused Digital Envoy to suffer actual damages, including lost income, licensing and business opportunities. The extent of Digital Envoy's damages is unknown and this disclosure will be supplemented as appropriate after further discovery and investigation.

Digital Envoy further notes that the damages included in this category are on going and, in fact, Google has increased its activities bringing harm to Digital Envoy.

Much of the information required to determine Digital Envoy's actual damages is in the possession, custody or control of Google. Specifically, Google possesses, and Digital Envoy will obtain through discovery, the identity of third parties with whom Google has shared Digital Envoy's technology, or otherwise provided data contained therein. Google also possesses the nature and extent of use made by each of these third parties.

With this information, Digital Envoy intends to determine the amount of lost income through lost business opportunities, and otherwise determine the fair value of Google's wrongful use of Digital Envoy's technology. To

the extent sufficient specificity of this category of damages cannot be achieved, Digital Envoy will claim recovery under the digorgement theories of recovery.

Many of the documents supporting this category are in Google's possession, custody or control and will be obtained through discovery. Additionally, Digital Envoy has identified documents in its possession which will support this category. Specifically, the documents identified in items 1, 5, 6, 8, 9 and 10 of Attachment C hereto as containing documents which support this category of damages.

## 2. *Disgorgement of Google's profits — recoverable under Counts I, II and IV*

Digital Envoy contends that, under the causes of action identified, it is entitled to a judgment in the amount of Google's profits obtained through the wrongful use of Digital Envoy's technology. This damage category includes Google's total profit on any revenue producing act which includes Digital Envoy as a portion of the service provided by Google, as apportionment of a lesser amount attributed to Digital Envoy's technology is inappropriate.

The extent of Google's profits gained through the wrongful use of Digital Envoy's technology is currently unknown and will be supplemented as appropriate after further discovery and investigation. Google has the information in its possession, custody or control necessary to calculate the exact amount claimed in this category, and Digital Envoy anticipates collecting this information from Google

Digital Envoy further notes that the amounts included in this category are accumulating and, in fact, Google has increased its activities which result in an acceleration of recoverable amounts in this category.

In 2003, Google received $144,411,000 in net revenues from placing advertisements on Google Network web sites. In the first quarter 2004, Google already received $82,246,000 for the same thing. These revenues are net of money paid to the Google Network members as a share in the revenue generated by the advertisement. A large percentage of this revenue was from advertisements for which geographic targeting was enabled.

Google's profit on this revenue is substantial. In 2003, the cost of revenue was only 12.7% of the net revenue. In the first quarter of 2004, the cost of revenue was 13.7%.

From 2002 through first quarter 2004, Google's net revenue less the cost of revenue for advertising placed on Google Network web sites was $207,915,000.

Digital Envoy's damages can be calculated by applying a percentage of revenues generated by advertisements in which geotargeting was enabled. Since Google promotes geographic targeting on its AdWords website and makes enablement obvious and easy when enrolling for the AdWords program, Digital Envoy expects this percentage to be significant.

The documents supporting this category are in Google's possession, custody or control. To the extent Digital Envoy has any uniquely-sourced documents, they will have been identified and produced in previous responses.

### 3. *Treble damages — recoverable under Count II*

Digital Envoy contends it is entitled to treble damages under Count II. This will be a mathematical calculation using the damage amounts determined in items 1 and 2 herein. There are no documents other than previously identified supporting the determination of the amount of this category.

### 4.    *Return of money earned — recoverable under Count V*

Digital Envoy contends that, under the Count V, it is entitled to a judgment in the amount of Google's earnings obtained through the wrongful use of Digital Envoy's technology.  This damage category includes Google's total revenues from any act which includes Digital Envoy as a portion of the service provided by Google, as apportionment of a lesser amount attributed to Digital Envoy's technology is inappropriate.

The extent of Google's earnings gained through the wrongful use of Digital Envoy's technology is currently unknown and will be supplemented as appropriate after further discovery and investigation.  Google has the information in its possession, custody or control necessary to calculate the exact amount claimed in this category, and Digital Envoy anticipates collecting this information from Google

Digital Envoy further notes that the amounts included in this category are accumulating and, in fact, Google has increased its activities which result in recoverable amounts in this category.

The documents supporting this category are in Google's possession, custody or control.  To the extent Digital Envoy has any uniquely-sourced

documents, they will have been identified and produced in previous responses.

## 5.    *Attorney's fees — recoverable under Counts II, III and IV*

Digital Envoy contends it is entitled to recover its attorney's fees under the counts identified.  The amount recoverable in this category will be on-going up to trial of this matter, and will be the proper subject of further discovery and disclosure as appropriate.

The documents supporting this category will be the fee bills and evidence of payment.  Digital Envoy will make such documents available as appropriate in this litigation.

## 6.    *Punitive damages — recoverable under Counts I and IV*

Digital Envoy contends it is entitled to punitive damages under the counts identified.  The amount recoverable in this category is to be determined by the enlightened conscience of the jury.

The documents supporting this category are in Google's possession, custody or control.  To the extent Digital Envoy has any uniquely-sourced documents, they will have been identified and produced in previous responses.